**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Joshua L. Crowell (#295411)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip C. Kim (*pro hac vice*)
275 Madison Avenue, Suite 3400
New York, New York 10116
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD BLASCO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC., BRIAN P. KELLEY, and FRANCES G. RATHKE,<br><br>Defendants. | Case No.: 3:15-cv-02766-VC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ........ 1

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 7

IV. BACKGROUND ........ 8

A. Keurig's Business ........ 8

B. The Keurig 2.0 ........ 10

C. The Keurig KOLD and Keurig MINI ........ 11

D. Keurig Former Employee Witnesses ........ 12

V. DEFENDANTS' FRAUDULENT CONDUCT ........ 13

A. Overview of the Fraud ........ 13

B. Defendants Materially Misrepresented the Magnitude of the Problems Associated with the Introduction of and Transition to the Keurig 2.0 ........ 14

1. Significant and Unresolved Technological Malfunctions ........ 14

2. Compatibility Constraints and Low Consumer Approval Ratings ........ 17

3. High Levels of Inventory and Dissatisfaction on Behalf of Retailers and Distributors ........ 19

4. Deceleration and Eventual Decline of Portion Pack Net Sales ........ 20

5. Kelley's and Rathke's Personal Involvement in the Introduction of and Transition to the Keurig 2.0 ........ 22

6. Defendants' Materially False and Misleading Statements and Omissions About the Keurig 2.0 ........ 23

a) 2014 Fourth Fiscal Quarter and 2014 Fiscal Year Financial Results 23

b) 2015 First Fiscal Quarter Financial Results ........ 27

c) 2015 Second Fiscal Quarter Financial Results ........ 31

C. Additional Allegations that Defendants Made Their False and Misleading Statements with Scienter ........ 33

D. The Revelation of the Truth About the Keurig 2.0 ........ 38

VI. LOSS CAUSATION ........ 40

VII. PRESUMPTION OF RELIANCE ........ 42

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........ 43

IX. CLASS ACTION ALLEGATIONS ........ 44

X. CLAIMS FOR RELIEF ........ 45

XI. PRAYER FOR RELIEF ........ 49

XII. JURY DEMAND ........ 49

1. Lead Plaintiffs Jessica Lee, Alan Schlussel, and Lawrence E. Wilder (collectively "Plaintiffs"), by and through their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Keurig Green Mountain, Inc. ("Keurig" or the "Company") from November 19, 2014, through August 5, 2015, inclusive (the "Class Period").

2. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP and The Rosen Law Firm, P.A. This investigation included, among other things, a review and analysis of: (i) Keurig's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Keurig's investor calls; (vi) interviews with former employees and other potential witnesses with relevant information; and (vii) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

3. Keurig produces, develops and sells a variety of coffeemakers ("Keurig brewers" or "Keurig brewing systems"), and produces and sells specialty coffee, teas, and other beverages for use with its Keurig brewing systems.

4. The specialty coffee, teas and other beverages produced and sold by Keurig include

coffee and beverages in pods for use with Keurig brewers, as well as traditional whole bean and ground coffee in other package types including bags, fractional packages, and cans. The coffee and beverage pods produced and sold by Keurig are available for sale in portion packs.

5. Keurig also partners with various coffee and beverage brands. For example, on November 19, 2014, Keurig reported that it offered more than 385 beverage varieties and over 50 brands as part of the Keurig system. Portion packs are produced and sold by Keurig and/or Keurig partners ("licensed portion packs"), but may also be produced and sold by unlicensed Keurig competitors ("unlicensed portion packs"). However, the portion pack market is dominated by Keurig and its partners. For example, on February 4, 2015, Keurig estimated that the market share of unlicensed portion packs was approximately 10% to 11% and would be single digits by the end of 2015.

6. Keurig markets and sells its beverages and brewing systems to retailers, including supermarkets, department stores, mass merchandisers, club stores, and convenience stores; to restaurants, hospitality accounts, office coffee distributors, and partner brands; and to consumers directly through Keurig's website.

7. During the Class Period, Defendants Keurig, its Chief Executive Officer ("CEO") Brian Kelley ("Kelley"), and its Chief Financial Officer ("CFO") Frances G. Rathke ("Rathke") (together, "Defendants") made numerous materially false and misleading statements and omissions concerning the problems associated with the introduction of and transition to the Keurig 2.0 brewing system.

8. Introduced to the market in August 2014, the Keurig 2.0 was touted as a "breakthrough innovation" that allowed users to brew both a single-cup of coffee and up to a four-cup carafe. Additionally, the Keurig 2.0 was the first Keurig brewer to incorporate Digital Rights Management ("DRM") technology, which enabled the Keurig 2.0 to read the ink on a pod's lid, identify whether the

pod was a single-cup pod ("K-Cup") or a four-cup carafe pod ("K-Carafe"), and provide the consumer with a choice of recipes based upon this identification. In September 2014, the K-Cup had one recipe, while the K-Carafe had six varieties. DRM technology also enabled the Keurig 2.0 to distinguish between licensed and unlicensed portion packs, as well as between Keurig 1.0 and Keurig 2.0 portion packs.

9. Defendants concealed from investors, however, that the Keurig 2.0 suffered from various technological malfunctions, including but not limited to: (i) coffee grounds would clog the brewing needle, causing the machine's pressure to get too high and leading the software to stop the brewing process; (ii) some K-Cups would cause coffee grounds or tea leaves to spray out of the brewer; (iii) there was difficulty powering the machine on and off; (iv) there were problems with the machine's brewing pump and heating; (v) brewing decaffeinated and extra bold coffee would cause the pods to swell too much, causing the machine to malfunction (together, the "Technological Malfunctions"). These were systematic design flaws rooted in the Keurig 2.0's software, electrical, brewer, heating, pump, and temperature and pressure controls.

10. Many of the Technological Malfunctions were identified during lab and consumer testing prior to the August 2014 launch of the Keurig 2.0. The cause of the brewing needle problem was confirmed in September 2014, well before the start of the Class Period. Yet Keurig's senior management, including Kelley, was undeterred by the array of Technological Malfunctions and insisted on proceeding with the launch anyway. As a result, the Company ordered more than 4.5 million Keurig 2.0 brewing systems – the largest production launch in the Company's history. At the time of the product's introduction to the market, these 4.5 million Keurig 2.0 brewing systems in inventory were plagued with the unresolved Technological Malfunctions.

11. The Keurig 2.0 debuted on the Company's website and at the flagship Keurig store on August 24, 2014, and became available at national retail partners in September 2014. Three major

versions of the Keurig 2.0 debuted at this time, the K350, the K450, and the K550, which ranged in the manufacturer's suggested retail price ("MSRP") from $149.99 to $199.99. A limited variety of portion packs debuted with the Keurig 2.0 brewing system, far fewer than had previously been available for the Keurig 1.0. Notwithstanding the defects in the Keurig 2.0 brewing system and the lack of variety in portion packs, Keurig announced the transition from its largely successful Keurig 1.0 to the Keurig 2.0, replacing the Keurig 1.0 within approximately one year of the launch of the Keurig 2.0. Given the Technological Malfunctions with the 2.0, this transition was bound to fail.

12. Upon its debut, the Keurig 2.0 suffered from low consumer approval ratings and experienced high rates of sales returns, due in part to the Technological Malfunctions and to compatibility constraints. As a result of its DRM technology, the Keurig 2.0 was incompatible or less compatible with (1) Keurig 1.0 portion packs; (2) unlicensed portion packs; and (3) the "My K-Cup" accessory, which had previously allowed consumers to brew the coffee of their choice on the Keurig 1.0, regardless of its brand. These compatibility constraints were particularly frustrating to consumers given that few varieties of licensed Keurig 2.0 compatible portion packs were available at the time of the August 2014 launch.

13. As a result of the Technological Malfunctions and compatibility constraints of the Keurig 2.0, as well as the corresponding low consumer approval ratings, consumers were dissuaded from purchasing the Keurig 2.0, and the Company experienced lower brewer sales and a disappointing holiday season. In fact, brewer and accessory net sales declined 5% for the 2014 fourth fiscal quarter, declined 18% for the 2015 first fiscal quarter, declined 23% for the 2015 second fiscal quarter, and declined 26% for the 2015 third fiscal quarter as compared to the prior year periods. But it was not until the end of the Class Period that the Company disclosed falling pods sales, which were also the result of the Technological Malfunctions and compatibility constraints.

14. The decrease in brewer and accessory net sales, combined with the high rates of sales

returns, resulted in high levels of inventory at Keurig warehouses, distributor warehouses, and retailers alike. Keurig incurred costs associated with storing this massive amount of excess inventory, and the high levels of inventory negatively impacted the Company's relationships. Eventually, in or around April 2015, Keurig shut down the production of the Keurig 2.0 in China and Malaysia. At this time, the Company still had millions of Keurig 2.0 brewing systems in inventory in the United States that were afflicted by the unresolved Technological Malfunctions. The production of the K450 and the K550 did not resume until July 2015, almost the end of the Class Period.

15. The decrease in brewer and accessory net sales also resulted in the deceleration, and ultimately the decline, of portion pack net sales. Keurig portion pack sales are intricately related to Keurig brewer sales, and as brewer and accessory net sales declined, the Company's "installed base" was negatively impacted, resulting in lower demand for and fewer net sales of portion packs. For example, compared to the prior year period, portion pack net sales increased 22% for the 2014 fourth fiscal quarter, increased 9% for the 2015 first fiscal quarter, increased 7% for the 2015 second fiscal quarter, and ultimately declined 1% for the 2015 third fiscal quarter.

16. Although the Keurig 2.0 suffered from the Technological Malfunctions and experienced low consumer approval ratings and high rates of sales returns, and the Company incurred higher costs of production, struggled to work through high levels of stagnant and flawed inventory, and temporarily stopped production of the Keurig 2.0, throughout the Class Period, Rathke and Kelley omitted material information concerning the Technological Malfunctions plaguing the Keurig 2.0 and consistently mischaracterized the problems as "transitory" and "seasonal." Such statements falsely indicated that the problems were of a short-term nature. Because the millions of Keurig 2.0 brewing systems in inventory suffered from systematic Technological Malfunctions, the problems with the Keurig 2.0 were not short-term at all. Rather, these problems would indefinitely hamper the Company's product transition from the Keurig 1.0 to the 2.0, and thus its financial performance, until

the Company solved the Technological Malfunctions, manufactured new units in significant numbers, and worked through its flawed inventory (by selling the units at a discount or writing them off).

17. Further, because portion pack sales are intimately related to Keurig brewer sales, the impact of these unresolved Technological Malfunctions was not limited to brewer and accessory net sales, but extended to portion pack sales as well. Due to the Technological Malfunctions, purchasers of the Keurig 2.0 used their brewers less frequently and consequently reduced their consumption of portion packs. For this reason, Defendants' statements touting Keurig's installed base were misleading because they failed to disclose that installed base growth was not the indicator of revenue growth that investors were led to believe.

18. The repercussions of the ongoing problems with the introduction of and transition to the Keurig 2.0 continued throughout the remainder of the Class Period. But it was not until after the market close on August 5, 2015, that the truth of Defendants' misrepresentations and omissions was revealed to the market. At this time, Keurig issued a press release titled, "Keurig Green Mountain Reports Third Quarter 2015 Results," and also filed its quarterly report with the SEC on Form 10-Q for the fiscal third quarter. The Company reported disappointing results, including a 26% decline in Keurig brewer and accessory net sales compared to the prior year period, which was attributed to, among other things, higher inventory levels at retailers—*i.e.*, the brewers sat on retailers' shelves because no one was buying them—and higher price discounts. For the first time since the introduction of the Keurig 2.0, the Company reported declines in pods sales (1%) and overall net sales revenue (5%) compared to the prior year period. In addition, the Company reported an $18 million write-off of Keurig 2.0 inventory. The Company was forced to update its outlook for fiscal year 2015, lowering its predicted revenue growth to a decline of low-single to mid-single digits compared to fiscal year 2014. During a conference call that was held after the market close on August 5, 2015, Kelley and Rathke disclosed that the Keurig 2.0 brewing system was suffering from certain technological

problems, including a clogged needle.

19. These disclosures caught the market by surprise. For example, SunTrust Robinson Humphrey ("SunTrust") reported that "the current state of affairs was much worse than expected." In reaction to Defendants' disclosures on August 5, 2015, during the next trading day on August 6, 2015, the Company's stock price plummeted $22.31 per share – nearly 30% – on heavy trading volume, to close at $52.67 per share. The revelation of Defendants' fraud obliterated billions of dollars of the Company's market capitalization.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

21. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Keurig conducts business and maintains a production facility in this District.

23. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

24. On September 28, 2015, the Court appointed Jessica Lee, Alan Schlussel, and Lawrence E. Wilder as Lead Plaintiffs. Plaintiffs purchased Keurig common stock during the Class Period and suffered damages as a result of the violations of federal securities laws alleged herein. Plaintiffs' PSLRA certifications previously on file with the Court are incorporated by reference.

25. Defendant Keurig is a Delaware corporation with its primary executive offices in Vermont, and production and distribution facilities in California, Tennessee, Vermont, Virginia, Washington, and Canada. Throughout the Class Period, Keurig common stock was actively traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol GMCR.

26. Defendant Kelley is, and at all relevant times was, CEO and President of Keurig and a member of its Board of Directors. Kelley joined the Company in December 2012. Throughout the Class Period, Kelley made materially false and misleading statements on conference calls with investors and analysts.

27. Defendant Rathke was, at all relevant times, the CFO and Treasurer of Keurig. On November 19, 2014, the Company announced that she would leave the Company no later than September 26, 2015. Rathke joined the Company in October 2003. Throughout the Class Period, Rathke made materially false and misleading statements on conference calls with investors and analysts.

28. Defendants Kelley and Rathke are collectively referred herein as the "Individual Defendants."

## IV. BACKGROUND

### A. Keurig's Business

29. Keurig produces, develops, and sells a variety of coffeemakers ("Keurig brewers" or "Keurig brewing systems"), and produces and sells specialty coffee, teas, and other beverages for use with its Keurig brewing systems. Keurig operates primarily in the United States and Canada.[1]

30. During the Class Period, the Keurig 2.0 was available in three major versions, the K350, the K450, and the K550, which ranged in MSRP from $149.99 to $199.99 respectively. The

[1] In fiscal year 2014 Keurig expanded outside of North America by launching a brewer in the United Kingdom; and in its November 19, 2014, Form 10-K Keurig announced its plans to continue to launch brewers in targeted countries outside of North America during fiscal year 2015.

K350 – the lowest-priced system – featured a 60-ounce water reservoir, a grayscale touchscreen display, and nine brew sizes ranging from four to thirty ounces. The K450 – the mid-priced system – featured a 70-ounce water reservoir, a color touchscreen display, and nine brew sizes ranging from four to thirty ounces. The K550 – the highest-priced system – featured a 80-ounce water reservoir, a large color touchscreen display, hot water on demand, and ten brew sizes ranging from four to thirty ounces.

31. The specialty coffee, teas and other beverages produced and sold by Keurig include coffee and beverages in pods for use with Keurig brewers, as well as traditional whole bean and ground coffee in other package types including bags, fractional packages, and cans. The coffee and beverage pods produced and sold by Keurig are available for sale in portion packs (sample-size of three pods up to a bundle-size of 96 pods).

32. Keurig also partners with various coffee and beverage brands. For example, on November 19, 2014, Keurig reported that it offered more than 385 beverage varieties and over 50 brands as part of the Keurig system. Portion packs are produced and sold by Keurig and/or Keurig partners ("licensed portion packs"), but may also be produced and sold by unlicensed Keurig competitors ("unlicensed portion packs"). These unlicensed portion packs became legally available after two key Keurig patents expired on September 16, 2012. However, the portion pack market is dominated by Keurig and its partners. For example, on February 4, 2015, Keurig estimated that the market share of unlicensed portion packs was approximately 10% to 11% and would be single digits by the end of 2015.

33. The Keurig brewing systems developed and sold by Keurig are produced primarily in China and Malaysia by third-party manufacturers. An Asia-based research, development, and quality control function provides manufacturing oversight, project management, and quality support. Every authorized distributor of Keurig brewing systems is bound by an annual Keurig Authorized Distributor

("KAD") Agreement. Under the terms of the KAD Agreement, each authorized distributor is required to sell a certain number of Keurig brewers to retain their KAD status.

34. Keurig sales teams market and sell Keurig beverages and brewing systems to retailers including supermarkets, department stores, mass merchandisers, club stores, and convenience stores; to restaurants, hospitality accounts, office coffee distributors, and partner brands; and to consumers directly through Keurig's website. Keurig divides its sales teams into teams focused on "At Home" products (the "AH channel") and teams focused on "Away From Home" products (the "AFH channel"). In the AH channel, Keurig targets individual coffee drinkers, and promotes their brewing systems primarily through mass merchants, specialty and department store retailers, select wholesale clubs, and the Company's website; as well as through regionally targeted and national television advertising. Keurig sales teams work closely with retailers on product plans, marketing programs, and other sales support. In the AFH channel, Keurig targets the office coffee channel, as well as food service and hospitality accounts. Keurig relies on a selective, but non-exclusive, network of distributors in the AFH channel, ranging in size from local to national distribution companies.

**B. The Keurig 2.0**

35. On January 29, 2014, prior to the Class Period, Keurig announced the introduction of a new brewing system, the Keurig 2.0. The Keurig 2.0 was touted as a "breakthrough innovation" that allowed users to brew both a single-cup of coffee and up to a four-cup carafe. Keurig intended to transition from the Keurig 1.0 to the Keurig 2.0, thereby replacing the Keurig 1.0 within approximately one year of the August 24, 2014 launch of the Keurig 2.0. For example, during the 2014 holiday season and into 2015, Keurig continued to ship both the Keurig 1.0 and 2.0 brewing systems, but marketing and merchandising was focused almost exclusively on the Keurig 2.0.

36. On August 24, 2014, prior to the Class Period, the Keurig 2.0 debuted on the Company's website, and became available at national retail partners in September 2014. Upon its

debut, the Keurig 2.0 experienced high rates of sales returns and suffered from low consumer approval ratings, in part due to Technological Malfunctions and compatibility constraints. As detailed below, the Keurig 2.0 had various Technological Malfunctions, including but not limited to one whereby the needle used to puncture the pod became clogged as a result of its angled-placement in the brewing system and the infiltration of coffee grounds into the needle. The problems with the Keurig 2.0 persisted throughout the Class Period. During this time, Keurig also lost more money on brewers than it had in the past owing to the higher cost of production for the Keurig 2.0. According to KeyBanc Capital Markets ("KeyBanc"), the Keurig 2.0 costs approximately $15 more to produce than the Keurig 1.0, in part due to the unpopular DRM technology.

### C. The Keurig KOLD and Keurig MINI

37. Prior to the Class Period, on February 5, 2014, Keurig announced the introduction of the Keurig Cold (later marketed as the "Keurig KOLD" or "KOLD"). The Keurig KOLD was touted as an "innovative, convenient way [for consumers] to freshly prepare their favorite cold beverages at the push of a button." More specifically, the Keurig KOLD was designed to allow consumers to create their own iced teas, sports drinks, seltzers, flavored waters, and carbonated fountain drinks at home and in the workplace. To develop the pods for use with the Keurig KOLD, Keurig partnered with the Dr. Pepper Snapple Group and The Coca-Cola Company.

38. Throughout the Class Period, Defendants represented that the KOLD was "on track" and "on target" to be introduced to the market in the Fall of 2015. Defendants also represented that the KOLD would be priced comparably to its hot brewing systems. Neither turned out to be true. On May 14, 2015, Keurig announced that instead of a full launch in the Fall of 2015, as everyone expected, the Keurig KOLD would have a phased-in launch. The KOLD would be available for sale only on the Company's website in the Fall of 2015, then be available in select retailers in certain metropolitan areas in time for the 2015 holidays, and not reach full national retail distribution until the

2016 holiday season. Moreover, the Company announced that the KOLD's price point – both for the unit and its pods – would be substantially higher than that of the hot brewing systems, leading many analysts to predict that the KOLD would be prohibitively expensive for mainstream consumers.

39. Also during the Class Period, on December 23, 2014, Keurig issued a voluntary recall of the Keurig MINI due to burn hazards, thereby effectively removing Keurig's only sub- $100 brewing system from the market. The recall was conducted by the United States Consumer Product Safety Commission. In anticipation of the recall, Keurig ceased shipping Keurig MINI brewing systems in November and December 2014.

40. With the stalled introduction of the prohibitively expensive KOLD and the recall of the dangerous Keurig MINI, it was critical for the Company to have a successful transition from the Keurig 1.0 to the Keurig 2.0. Defendants already had two disappointing product lines on their hands, and the Company might not be able to withstand a third. Thus, Defendants were under tremendous pressure to conceal – or at least downplay – any problems with the Keurig 2.0.

**D. Keurig Former Employee Witnesses**

41. Plaintiffs' allegations are supported by three former employee witnesses ("FEs"), each of whom was employed by Keurig during the Class Period.

42. FE-1, employed by Keurig from October 2011 through August 2015, was first a Senior Manufacturing Engineer, and was later promoted to Program Manager in Technology. FE-1 reported to Director of Technology Jim Lewicki, Director of Contract Manufacturing Louis Roth, and Senior Director of Manufacturing and Operations Greg Montemurro. FE-1 managed a cross-functional team that worked from concept to production launch on developing the Keurig 2.0 brewing system and the beverages for it. FE-1 was the point person from business plan to launch, responsible for staying on top of what everyone on the team was working on and providing senior leadership with updates.

43. FE-2, employed by Keurig from April 2012 through November 2014, was an Account

Manager. FE-2 reported directly to Field Sales Manager Jackie Rios-Torchia and the National Director of Field Sales Independent Accounts Mike Williamson.

44. FE-3, employed by Keurig from November 2009 through April 2015, was an Area Sales Manager in California, Nevada, Utah, and Arizona. FE-3 reported directly to Regional Sales Manager David Mattice.

## V. DEFENDANTS' FRAUDULENT CONDUCT

### A. Overview of the Fraud

45. As a result of the material misrepresentations and omissions alleged below, Defendants publicly disseminated misleading information regarding the introduction of and transition to the Keurig 2.0. The Keurig 2.0 suffered from unresolved and significant Technological Malfunctions, which were identified during consumer and lab testing prior to the launch of the Keurig 2.0 brewing system. These Technological Malfunctions included but were not limited to a clogged brewing needle, whereby the needle used to puncture the pod clogged due to its angled-placement in the brewing system and the infiltration of coffee grounds into the needle. Although Keurig management consistently characterized the problems associated with the introduction of and transition to the Keurig 2.0 as "transitory," these problems were more fixed in nature. The entire inventory of 4.5 million Keurig 2.0 brewing systems produced in anticipation of the August 24, 2014 launch was plagued with such Technological Malfunctions. Further, millions of defective Keurig 2.0 brewing systems still languished in inventory when the Company temporarily stopped production in or around April 2015. Consequently, the Company would indefinitely continue to have problems associated with the introduction of and transition to the Keurig 2.0 until the Company solved the Technological Malfunctions, manufactured new units in significant numbers, and worked through its existing flawed inventory (by selling the units at significant discounts or simply writing them off).

46. In sum, Defendants made materially false and misleading statements and omissions by: (1) failing to inform the investing community of the significant and unresolved Technological

Malfunctions related to the Keurig 2.0 brewing needle; (2) mischaracterizing the problems associated with the introduction of and transition to the Keurig 2.0 as "transitory" and "seasonal"; (3) misleadingly touting its "installed base" of brewer systems; and (4) repeatedly minimizing the magnitude of the problems plaguing the Keurig 2.0.

### B. Defendants Materially Misrepresented the Magnitude of the Problems Associated with the Introduction of and Transition to the Keurig 2.0

#### 1. Significant and Unresolved Technological Malfunctions

47. The Keurig 2.0 was the first Keurig brewer to incorporate DRM technology (trademarked as "Keurig brewing technology"), which enabled the Keurig 2.0 to read the ink on a pod's lid, identify whether the pod was a single-cup pod ("K-Cup") or a four-cup carafe pod ("K-Carafe"), and provide the consumer with a choice of recipes based upon this identification. DRM technology also enabled the Keurig 2.0 to distinguish between licensed and unlicensed portion packs, as well as between Keurig 1.0 and Keurig 2.0 portion packs.

48. Despite being touted as a "breakthrough innovation," FE-1 explained that the Keurig 2.0 was plagued with various Technological Malfunctions, including but not limited to: (i) coffee grounds would clog the brewing needle, causing the machine's pressure to get too high and leading the software to stop the brewing process; (ii) some K-Cups would cause coffee grounds or tea leaves to spray out of the brewer; (iii) there was difficulty powering the machine on and off; (iv) there were problems with the machine's brewing pump and heating; (v) brewing decaffeinated and extra bold coffee would cause the pods to swell too much, causing the machine to malfunction.

49. The Technological Malfunctions were strictly related to design problems. According to FE-1, a manufacturing engineer who worked closely with the development of the Keurig 2.0, "[t]he manufacturers did a good job with the brewers." FE-1 explained: "It's the way the brewer was designed to work, the software and electrical, the K 2.0 brewer and its heating, pump system, K-cups weren't meant to be used, the temp and pressure were a mess."

50. The problem with the brewing needle exemplifies the Keurig 2.0's flawed design. As part of the brewing process, both the Keurig 1.0 and the Keurig 2.0 utilize a needle to puncture each portion pack. However, unlike the Keurig 1.0, the Keurig 2.0, at the request of management, was designed to be compatible with Keurig Vue[2] portion packs. To effectuate this request, the brewing needle in the Keurig 2.0 was placed at a 45-degree angle. As a result of its angled placement, coffee grounds entered the brewing needle, causing the needle to clog and the machine to sputter and power off. According to FE-1, due to the clogged needle the Keurig 2.0 "sounded like it was dying." FE-1's account of the clogged needle defect was ultimately corroborated by the Defendants' corrective disclosures on August 5, 2015, that (1) acknowledged the existence of the clogged needle defect, and (2) reported an $18 million write-off of Keurig 2.0 brewing systems inventory.

51. FE-1 states that the Technological Malfunctions were identified during lab and consumer testing prior to the launch of the Keurig 2.0 in August 2014. The testing was conducted in the Spring of 2014, with more than 700 consumers participating in the tests. The Company generated internal reports regarding the results of these tests, and disseminated the reports to the technology team. FE-1 further states that Chief Technology Officer, Kevin Sullivan, who reported to Kelley daily, was the first to receive these reports. The Company's Production Test Coordinator, Eileen Goggin, was particularly concerned with the results of the tests and, according to FE-1, "brought up problems [raised by] home-use tests all the time: clogged needles and no-brew were the main issues." By September 2014, still well before the start of the Class Period, the Company had identified the cause of the clogged needle defect.

52. Nevertheless, Keurig management was undeterred by the array of Technological Malfunctions and insisted on proceeding with an August 2014 launch. This decision was motivated,

[2] The Keurig Vue was a brewing system introduced in 2012, and discontinued in 2015. The Vue allowed consumers to alter coffee strength and water temperature, but was largely unsuccessful.

at least in part, by management's desire to have the Keurig 2.0 on retail shelves in time for the 2014 holiday season. According to FE-1, "Brian [Kelley] is the reason why the brewer launched before it was ready, he gave a date and we had to rush the brewer. . . . There were major performance issues." FE-1 also stated that the Company rushed the Keurig 2.0 to market and the production of compatible portion packs despite concerns that there were an insufficient number of portion pack varieties to satisfy customers who were used to the myriad varieties available for the Keurig 1.0. This lack of variety was particularly pronounced in the K-Carafe portion packs, and although the most substantial innovation of the Keurig 2.0 was its ability to brew up to a four-cup carafe, relatively few K-Carafe portion packs were available at the time of launch.

53. In preparation of the August 2014 launch of the Keurig 2.0, Keurig produced 4.5 million Keurig 2.0 brewing systems, the largest production launch in the Company's history. The Keurig 2.0 brewing systems were produced in China and Malaysia. At the time of the product launch, this entire inventory of Keurig 2.0 brewing systems suffered from systematic Technological Malfunctions. Further, at the time of launch, Keurig engineers were continuing to develop solutions to these Technological Malfunctions, and the malfunctions plaguing the Keurig 2.0 were therefore unresolved. Regardless, as the 4.5 million Keurig 2.0 brewing systems launched in August 2014, millions more were being manufactured in China and Malaysia.

54. The Keurig 2.0 debuted on the Company's website and at the flagship Keurig store on August 24, 2014, and became available at national retail partners in September 2014. Three major versions of the Keurig 2.0 debuted at this time, the K350, the K450, and the K550, which ranged in MSRP from $149.99 to $199.99. A limited variety of portion packs debuted with the Keurig 2.0 brewing system, far fewer than had previously been available for the Keurig 1.0. Notwithstanding the defects in the Keurig 2.0 brewing system and the lack of variety in portion packs, Keurig intended to transition from its largely successful Keurig 1.0 to the Keurig 2.0, thereby replacing the Keurig 1.0

within approximately one year of the launch of the Keurig 2.0.

55. It was not until after the 2014 holiday season, and the disappointing reception of the Keurig 2.0, that the Company even began to attempt to resolve the Technological Malfunctions. At this time, the Company sent a technology team to its production facilities in Malaysia to address the Technological Malfunctions. Upon returning from Malaysia in March 2015, the technology team "started trying to work on time, temperature and technical solutions." Eventually, in or around April 2015, the Company shut down production of the Keurig 2.0 in China and Malaysia to make mechanical, electrical, and software modifications to the brewing system. Despite these efforts, the Technological Malfunctions persisted and technology teams were continuing to address these malfunctions at least through the end of the Class Period.

**2. Compatibility Constraints and Low Consumer Approval Ratings**

56. Upon its debut, the Keurig 2.0 suffered from low consumer approval ratings and experienced high rates of sales returns. According to a report produced by UBS Securities LLC ("UBS"), in January 2015, across four major consumer websites – Amazon, Best Buy, Walmart, and Bed Bath & Beyond – and more than 20,000 customer reviews, the average rating of the Keurig 2.0 was just 2.8 out of 5.0, significantly worse than the average rating of 4.2 given to older Keurig models. Moreover, only 70% of Keurig 2.0 purchasers were likely to recommend the product, as compared to 93% of purchasers of older Keurig models. FE-2, an Account Manager at Keurig during the Class Period, stated, "I was on a bus with the marketing team and they were horrified by the responses they were getting on Facebook. . . . As a rep I would google the company and every response was negative, just tons and tons of bad responses."

57. These low consumer approval ratings were due in large part to the Technological Malfunctions and also to compatibility constraints associated with the Keurig 2.0. As a result of its DRM technology, the Keurig 2.0 was incompatible or less compatible with (1) Keurig 1.0 portion

packs; (2) unlicensed portion packs; and (3) the "My K-Cup" accessory, which had previously allowed consumers to brew the coffee of their choice on the Keurig 1.0, regardless of its brand. Consumers were therefore limited to purchasing licensed Keurig 2.0 compatible portion packs, which proved particularly frustrating given that few varieties of licensed Keurig 2.0 compatible portion packs were available at the time of the August 2014 launch.

58. The low consumer approval ratings dissuaded consumers from purchasing the Keurig 2.0, and the Company experienced lower than average sales of Keurig brewers and a disappointing holiday season. In fact, as compared to the prior year period, brewer and accessory net sales declined throughout the Class Period: 5% in the 2014 fourth fiscal quarter, 18% in the 2015 first fiscal quarter, 23% in the 2015 second fiscal quarter, and 26% in the 2015 third fiscal quarter.

59. While consumer approval ratings floundered and brewer net sales declined, Keurig also experienced high rates of sales returns. According to FE-2, "[the Keurig] 2.0 was a disaster, if you look at anywhere with customer comments, many, many say I packed it up and took it back to Target or Walmart."

60. The Company was aware of the floundering consumer approval ratings and high rates of sales returns. The Company maintains a consumer service phone-line, and during the Class Period consumers regularly called the line seeking assistance with the Keurig 2.0 brewing system. For example, during the November 19, 2014 conference call, Kelley expressed his hope that the number of unhappy consumers utilizing this phone-line would gradually decline. By the February 4, 2015 conference call, Defendant Kelley acknowledged that the phone-line was still regularly used by consumers seeking assistance with the Keurig 2.0, and stated that marketing changes implemented by Keurig during the quarter made the phone number more conspicuous to consumers. Kelley also stated that the Company "track[s] and analyze[s]" consumer ratings, and tracks call center data. As described in more detail in the sections to follow, the Company also held weekly meetings that tracked

issues such as consumer complaints and circulated internal reports to Kelley and Rathke.

**3. High Levels of Inventory and Dissatisfaction on Behalf of Retailers and Distributors**

61. The decrease in brewer and accessory net sales, combined with the high rates of sales returns, resulted in high levels of inventory at Keurig warehouses, distributor warehouses, and retailers alike. Keurig incurred costs associated with storing this massive amount of excess inventory, and the high levels of inventory at retailers and distributors negatively impacted the Company's relationships.

62. As a result of the Technological Malfunctions and compatibility constraints of the Keurig 2.0, as well as the corresponding low consumer approval ratings, retail customers struggled to sell-through Keurig 2.0 brewers to consumers. According to SunTrust, sell-through of brewers was actually worse than shipment growth during the first quarter of fiscal year 2015; and according to William Blair & Company, L.L.C. ("William Blair"), sell-through at retail was lower by 11% for the second quarter of fiscal year 2015. Keurig sales teams experienced these lackluster results firsthand. FE-3, an Area Sales Manager for California, Nevada, Utah, and Arizona at Keurig during the Class Period, was responsible for Staples, one of Keurig's largest retail customers. FE-3 recalled that sales of the Keurig 2.0 in Staples "was very, very slow . . . they just weren't moving."

63. Poor sell-through at retailers translated to high levels of stagnant inventory at distributor warehouses. Keurig distributors are bound by an annual Keurig Authorized Distributor ("KAD") Agreement. Under the terms of the KAD Agreement, each distributor is required to sell a certain number of Keurig brewers to retain their KAD status. Distributors purchase brewers and accessories from Keurig, and sell them to retail customers. Because retail customers were unable to sell then existing Keurig 2.0 brewing systems through to consumers, demand on behalf of retail customers deteriorated. In an effort to sell the Keurig 2.0 in a low-demand market distributors were forced "to discount brewers because they owned them." As FE-3 recalled, distributors were naturally

angry about this development. Similarly, FE-2 stated that, after the launch of the Keurig 2.0, FE-2 spent most of his or her time attempting to minimize the negative impact of the Keurig 2.0, but distributors were still "dropping like flies." Even distributors FE-2 "couldn't imagine dropping" Keurig did drop it.

64. Ultimately, in or around April 2015, the Company shut down production of the Keurig 2.0 in China and Malaysia. At this time, millions of Keurig 2.0 brewing systems remained in inventory in the United States. Again, this remaining inventory was still plagued by the unresolved systematic Technological Malfunctions. Production of the K450 and K550 did not resume until nearly the end of July 2015. As FE-1 stated, the decision to shut down production was made because, "[t]he brewers weren't moving so [Keurig] couldn't produce more." As explained above, production was also shut down to make necessary mechanical, electrical and software modifications to the Keurig 2.0 brewing system.

65. On May 6, 2015, at the Company's quarterly conference call, Keurig announced that it was implementing incremental promotional programs with retail partners to bring inventory down to more typical levels. Next, on August 5, 2015, at the Company's quarterly conference call, Keurig announced that it had implemented high promotional levels in an effort to clear inventory.

66. Overall, the inventory at the end of the 2015 first fiscal quarter was higher compared to the prior year period; during the 2015 second fiscal quarter, high inventory levels at retailers negatively impacted shipments; and by the 2015 third fiscal quarter, Keurig was still attempting to work through high levels of inventory at retail locations.

### 4. Deceleration and Eventual Decline of Portion Pack Net Sales

67. The decrease in brewer and accessory net sales not only impacted inventory levels of brewers, but also negatively impacted portion pack volumes. As UBS aptly noted, Keurig "employs a 'razor and blade' model, selling brewers roughly at cost and replenishable K-Cups at a margin-

accretive mark up." Similarly, Roth Capital Partners explained that, "[a]n increased installed brewer base translates to increased portion pack consumption, which is where the company's profits are derived in its razor/blade business model."

68. The inverse is also true: As brewer and accessory net sales declined, the Company's "installed base" grew more slowly than expected, and portion pack net sales decelerated and ultimately declined over the course of the Class Period. As compared to the prior year period, portion pack net sales increased 22% in the 2014 fourth fiscal quarter, increased 9% in the 2015 first fiscal quarter, and increased 7% for the 2015 second fiscal quarter. During the 2015 third fiscal quarter, however, the problems with the Keurig 2.0 caught up with portion pack sales. At the end of the Class Period, the Company reported that, for the first time since the introduction of the Keurig 2.0, portion pack net sales actually declined 1% as compared to the prior year period.

69. Prior to the August 5, 2015, announcement of the Company's third fiscal quarter results, analysts had widely predicted revenue growth in portion pack sales. For example, according to Susquehanna Financial Group, LLP ("Susquehanna"), the consensus had predicted a 6% increase in portion pack revenue growth for the 2015 third fiscal quarter. Similarly, William Blair had predicted a 5% increase in portion pack sales. The 1% decline in portion pack net sales shocked analysts, with SunTrust going so far as to say, "[t]he real surprise was the pod revenue decline."

70. Notably, this deceleration and eventual decline of portion pack net sales occurred because the Keurig 2.0 brewing system was plagued by significant and unresolved Technological Malfunctions. While it is true that the Company's "installed base" grew more slowly than expected due to disappointing holiday sales, it is only half the truth. The disappointing holiday sales were themselves the natural and foreseeable result of consumers' unwillingness to purchase defective machines, and, even when they had purchased a machine, their reluctance to use it.

**5. Kelley's and Rathke's Personal Involvement in the Introduction of and Transition to the Keurig 2.0**

71. Keurig management is organized such that team leaders report to directors; directors report to senior directors; senior directors report to Vice Presidents; Vice Presidents report to Presidents and Chief Officers; and the Presidents and Chief Officers ultimately report to Kelley.

72. FE-1 explained that Keurig held recurring meetings on Friday mornings that were attended by the directors of engineering, manufacturing, quality, product marketing, program management, data analytics, and customer service. These Friday meetings were run by the staff of the Senior Vice President of Quality and Manufacturing, John Naughton. During these Friday meetings, which FE-1 personally attended during the Class Period, the data analytics group presented various charts and reports showing current sales and tracking consumer complaints. Naturally, the charts presented by the data analytics group during the Class Period depicted declining brewer and accessory sales and consumer complaints. The President of Sales received the charts and reports compiled by the data analytics team, and the President of Sales reported directly to Kelley. Further, the Chief Technical Officer, Kevin Sullivan, who reported to Kelley daily, attended these Friday meetings at least through April 2015.

73. FE-1 stated that in addition to the weekly meetings, Keurig generated internal reports about sales and complaints, which were passed on to Kelley. According to FE-1, everyone at the Company was acutely aware of the declining sales and widespread consumer complaints, and by no later than January 2015, senior leadership "knew the dimension of the problem."

74. Indeed, Kelley and Rathke had access and reviewed the aforementioned reports presented at these meetings as each of them made statements to investors about the Keurig 2.0, including but not limited to its sales, customer response, and inventory, as detailed throughout this Complaint. If Kelley and Rathke had not reviewed such information prior to making their public statements in this regard, their public statements had no basis and were deliberately reckless.

### 6. Defendants' Materially False and Misleading Statements and Omissions About the Keurig 2.0

75. During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Keurig's SEC filings and during its investor conference calls in regards to the introduction of and transition to the Keurig 2.0. These actionable statements and omissions fall into four categories: (1) omissions concerning the various Technological Malfunctions that affected the introduction of and transition to the Keurig 2.0 brewing system; (2) statements characterizing the problems associated with the Keurig 2.0 brewing system as "transitory" and "seasonal"; (3) statements touting the Company's "installed base" of brewer systems; and (4) other statements minimizing the magnitude of the problems plaguing the Keurig 2.0.

#### a) 2014 Fourth Fiscal Quarter and 2014 Fiscal Year Financial Results

76. On November 19, 2014, the first day of the Class Period, Keurig issued a press release titled "Keurig Green Mountain Announces Strong Fourth Quarter and Fiscal Year 2014 Financial Results." For the fourth quarter, the Company reported net sales revenue growth of 14%, non-GAAP adjusted operating income growth of 26%, and GAAP adjusted operating income growth of 29%. The Company also reported a 5% decline in brewer and accessory net sales and a 22% increase in portion pack net sales for the quarter. For fiscal year 2014, the Company reported net sales revenue growth of 8%, non-GAAP adjusted operating income growth of 22%, and GAAP adjusted operating income growth of 24%. For the year, the Company also reported a 1% decline in brewer and accessory net sales and a 13% increase in portion pack net sales. Also on November 19, 2014, Keurig filed its annual report with the SEC on Form 10-K for the 2014 fiscal year, and Defendants Kelley and Rathke held an earnings conference call, during which they reiterated the financial results reported in the press release and the Form 10-K.

77. During the November 19, 2014, conference call, Defendant Rathke explained the high levels of Keurig brewer inventory:

> At the end of our fiscal year, inventory was $835 million, representing a 24% increase over the prior-year period, consistent with our expectation of inventory acceleration in the fourth quarter. ***The increase from the prior quarters is related to the normal fourth-quarter seasonality**, **as we ship brewers for the holiday season.***

(Emphasis added.)

78. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Although Keurig has traditionally increased inventory levels during its fourth quarter to prepare for holiday sales, the high level of brewer inventory on hand at the end of the 2014 fourth fiscal quarter was unusual, due in part to the fact that Keurig had recently executed the largest production launch in the Company's history (approximately 4.5 million Keurig 2.0 brewing systems) and brewer and accessory net sales had declined 5% during the 2014 fourth fiscal quarter, compared to the prior year period. Further, even if the high levels of Keurig brewer inventory were related to normal fourth-quarter seasonality, because the entire inventory of Keurig 2.0 brewing systems suffered from unresolved and significant Technological Malfunctions – a fact which the Defendants were well aware of – these high levels of inventory were bound to stay for far longer than the holiday season.

79. During the November 19, 2014, conference call, Defendant Kelley characterized the sell-through at retail of the Keurig 2.0:

> ***The sell-through is equally as strong as the sell-in***. We're selling both 1.0 and 2.0 brewers right now, but remember in October, we – last year, we had a very, very strong unit month because we promoted brewers really for the first time and we did it aggressively at quite low price points. ***So even up against that, we're very, very pleased with the sell-through of the 2.0 and the 1.0 brewers that are remaining.***

(Emphasis added.)

80. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. The sell-through simply was not as strong as the sell-in, as evidenced by

the high levels of inventory at Keurig warehouses, distributor warehouses, and retailers alike. In fact, when FE-2 was asked whether the above statement was accurate, FE-2 emphatically responded by stating, “That’s so false.”

81. During the November 19, 2014, conference call, Defendant Kelley highlighted the success of its Keurig 2.0 brewing system:

> The current Keurig owner who has packs that are unlicensed packs or don’t work in the pod, that’s the issue that we want to make sure we [stall] for them. ***They love the machine, the quality of the machine is excellent.***
>
> ***We’ve seen very, very little, if any disappointment with the machine. The disappointment is with the usage of the pods and which pods can be used. Again, we knew we’d go through a transition like this and so we are we’re working through that.***

(Emphasis added.)

82. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. First, consumer disappointment was not limited to the usage of the pods and related compatibility constraints, but instead, extended to the machine itself as a result of its unresolved Technological Malfunctions. Second, far from being transitory, the problems plaguing the Keurig 2.0 were fixed in nature. Because Keurig had proceeded with the production and launch of the Keurig 2.0 prior to resolving its Technological Malfunctions, all of the Keurig 2.0 brewing systems in inventory at the time of this statement had Technological Malfunctions. Consequently, the problem faced by Keurig was not merely one of increasing consumer portion pack options or phasing incompatible portion packs out of retail locations, it was a fixed problem that could only be solved by writing off the defective brewers or selling them at a significant discount.

83. During the November 19, 2014, conference call, Defendant Kelley discussed adding portion pack varieties to the Keurig 2.0 brewing system:

> [O]verall, the 2.0, we're very pleased. ***The quality is excellent,*** the majority of unlicensed brands have agreed to come in, and there will be more, ***our retailers are fully behind it, 100% of our partners are in. I mentioned the number brands and varieties we have and we will soon have.***
>
> *       *       *
>
> ***But there's no question, there are consumers who have packs that are not yet into the new pod structure and so that's where the consumer is not only confused, but disappointed, if they have those, and we hope they continue to call us.***
>
> *       *       *
>
> [W]e think about three things that we look at when we look at portion packs for 2015…The second is certainly going to be ***the speed with which we bring on our new partners and brand friends that are coming into the system, the speed with which we get them in, and get them onto the shelf, and get them into the system will also drive the portion pack growth this year.***

(Emphasis added.)

84. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. First, the quality of the Keurig 2.0 brewing system was not excellent given that it suffered from various Technological Malfunctions, including but not limited to, difficulty powering on, problems with the brewing pump, and a clogged brewing needle. As a result of these unresolved Technological Malfunctions, consumer complaints were not limited to pod compatibility, but instead, extended to the machine itself. Second, neither the variety of available compatible portion packs nor the speed with which they were made available to consumers, had the capacity to drive portion pack sales. Keurig portion pack sales are intricately related to Keurig brewer sales, and as brewer and accessory net sales declined due to the Technological Malfunctions plaguing the Keurig 2.0 brewing system, the Company's "installed base" was negatively impacted and the net sales of portion packs decelerated.

85. Following Defendants' materially false and misleading statements and omissions on November 19, 2015, analysts at firms such as William Blair and KeyBanc highlighted the progress

that the Company had made toward the conversion of unlicensed portion packs, thereby evidencing that the market was misled with regard to the underlying problem: the Keurig 2.0 brewing system was defective.

**b) 2015 First Fiscal Quarter Financial Results**

86. On February 4, 2015, Keurig issued a press release titled, "Keurig Green Mountain Announces Fiscal First Quarter 2015 Results." For the first quarter of fiscal year 2015, the Company reported no growth in net sales revenue, non-GAAP adjusted operating income growth of 4%, and GAAP adjusted operating income growth of 5%. The Company also reported an 18% decline in brewer and accessory net sales and a 9% increase in portion pack net sales. Keurig updated its outlook for fiscal year 2015, lowering its predicted revenue growth to mid- to high-single digits. The Company maintained that its revenue came in below expectations due in part to a weaker than expected holiday season and the voluntary recall on the Keurig MINI Plus.

87. Also on February 4, 2015, Keurig filed its quarterly report with the SEC on Form 10-Q for the 2015 fiscal first quarter. Defendants Kelley and Rathke also held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release and the Form 10-Q.

88. During the February 4, 2015 conference call, Defendant Kelley characterized the problems associated with the Keurig 2.0:

> As we look at the quarter, ***the issues impacting our results are transitory and part of a complex product transition that we knew would be challenging***. We are confident in our strategy and are proceeding resolutely, as we continue to see growth prospects for the Keurig hot system.
>
> * * *
>
> Importantly, new consumers love the 2.0, which is strategically fundamental to our growth. ***Current users will go through a transition with their portion packs at home, but it's only transitory. We're in the middle of an important strategic transition in our business.*** And while we currently have high brewer inventory levels and face some consumer confusion with Keurig 2.0, we're taking decisive

> steps to address these issues and execute with excellence over the remainder of the year.
>
> * * *
>
> We attribute that to the fact that they got off to a slow start, the 2.0 did – got off to a slow start, because of consumer confusion, ***and it improves as time goes on.***
>
> *** * ***
>
> Yes, we look at the ***transitory issues*** as – what we mentioned, for instance, when a new user comes in, what really is encouraging for 2.0 is that they're very excited about the brewer. They love the product. If you've been a current Keurig owner for quite a while and you're trading up, and you had old packs, those were the ratings that were low. You heard my remarks that 80% of those very low ratings, the 1 star ratings, when we track and analyze them, 80% of them were caused by the non-compatible pack issue.
>
> ***So we know that's a transitory issue. That's going to resolve itself. And it's going to resolve itself with some speed over time here, as we get through retailers clear of all that old inventory.***

(Emphasis added.)

89. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Again, the issues impacting Keurig's results were fixed in nature, not transitory. All of the Keurig 2.0 brewing systems in inventory at the time of this statement had Technological Malfunctions. Hence, the problem faced by Keurig was not merely one of increasing consumer portion pack options or phasing incompatible portion packs out of retail locations, it was a fixed problem that could only be solved by writing off the millions of Keurig 2.0 brewing systems in inventory or selling them at a significant discount.

90. Due to Defendants' false and misleading statements and omissions made during the February 4, 2015, conference call, analysts reported that the problems associated with the introduction of and transition to the Keurig 2.0 brewing system were transitory, evidencing that the market was misled. For example, KeyBanc reported the following:

> Yesterday's results and management's commentary on the call validated our view (outlined in our preview note earlier this week) that holiday brewer sales were disappointing, but that the weaker than expected sales trends were driven by transitory issues such as the Mini recall, slow transition to portion pack inventory and negative online reviews. We came away from our follow-up calls with management feeling more confident that the aforementioned issues are transitory in nature and that the Company can course correct.

91. During the February 4, 2015 conference call, Defendant Kelley omitted material facts necessary to make his statements regarding the performance of the Keurig 2.0 true, and instead stated that:

> So the quality of the pods in brewers – the point I want to make sure everyone understands – the quality of the pods in brewers are excellent. They're excellent. ***The 2.0 brewers are excellent. The pods are excellent, always have been. We didn't have an execution issue that impacted anything like that. We have a conversion issue in terms of making sure the pods sell through, and that we get them exited from consumers' homes as quickly as possible – the old pods.***

(Emphasis added.)

92. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. The Keurig 2.0 brewing system had Technological Malfunctions at the time of its launch, and thus, was not excellent. Additionally, Keurig did have an execution issue given that it knowingly launched a brewing system that suffered from the Technological Malfunctions. Accordingly, while Keurig did face a conversion issue, it was far from the only or the most important problem it faced with regards to the introduction of and transition to the Keurig 2.0.

93. During the February 4, 2014, conference call, Defendant Kelley discussed adding portion pack varieties to the Keurig 2.0 brewing system:

> Quite simply, our launch got off to a slower start than we planned, due to a few important factors. ***First, our efforts to get new packs transitioned onto retail shelves and into homes did not move quickly enough.*** There was also confusion among consumers as to whether the 2.0 would still brew all of their favorite brands.

* * *

> ***The compatibility issue should continue to subside over the remainder of the year, as we execute these enhancement and integrate additional formerly unlicensed brands, such as Community Coffee, into our system over the coming months, and continue to add new brands to our system.***

(Emphasis added.)

94. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. First, the launch of the Keurig 2.0 brewing system did not get off to a "slower start than [the Company] planned" due to lack of portion pack variety alone. Instead, the slow start was primarily driven by the unresolved Technological Malfunctions plaguing the Keurig 2.0 brewing system. Second, even if the compatibility issue were to "subside over the remainder of the year" due to increased portion pack variety, this increased variety was irrelevant given that the machine the portion packs were to be used on was defective.

95. During the February 4, 2014, conference call, Defendant Rathke discussed disappointing portion pack volumes:

> Portion pack volumes came in slightly less than we had expected. ***And one of the contributing factors is, we believe that when brewers are purchased, especially in this key holiday gift season, people typically will buy extra portion packs to bring home or gift. And if it's somebody who's walking in and replacing a 1.0 brewer they had with a 2.0 brewer, the anecdotal data we're hearing is that the person would not have bothered to buy new portion packs, because already have some at home.***

(Emphasis added.)

96. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. While it may be true that portion pack volumes were negatively impacted by a greater-than-expected number of repeat consumers upgrading from the Keurig 1.0 to the Keurig 2.0 during the holiday season, rather than first time consumer purchases, it is misleading to attribute the disappointing portion pack volumes to this phenomenon alone. Instead, brewer and accessory net

sales declined due to the Technological Malfunctions plaguing the Keurig 2.0, the Company's "installed base" thereafter grew more slowly than expected, and related portion pack volumes decelerated in line with the slow growing "installed base."

**c) 2015 Second Fiscal Quarter Financial Results**

97. On May 6, 2015, Keurig issued a press release titled, "Keurig Green Mountain Reports Fiscal Second Quarter 2015 Results." For the second quarter of fiscal year 2015, the Company reported net sales revenue growth of 2% (3% excluding foreign currency), non-GAAP adjusted operating income growth of 5%, and GAAP adjusted operating income growth of 6%. The Company also reported a 23% decline in brewer and accessory net sales and a 7% increase in pod net sales. Keurig again updated its outlook for fiscal year 2015, lowering its predicted revenue growth to flat- to low-single digits. The Company maintained that its top-line growth was below expectations primarily due to the slower than expected transition to the Keurig 2.0 system.

98. After the market closed on May 6, 2015, Keurig filed its quarterly report with the SEC on Form 10-Q for the fiscal second quarter. Defendants Kelley and Rathke also held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release and the Form 10-Q.

99. During the May 6, 2015, conference call, Defendant Kelley characterized the problems associated with the Keurig 2.0:

> There's no inconsistency in the fact that ***the transition we talked about last quarter is the same transition we're taking about this quarter***.
>
> We are smarter now. We know what the ***transition*** elements need to be. Some of the plans were in place' many of these are new because we have a clear indication, both on brewers and pods, of what's actually happening in the market. And it's complex. There's no question it is complex. It is not a simple process to ***transition*** like this. It is strategically critical that we do it. And so that's why we're going through it.

* * *

> Yes, the predominant message the consumer gave us, it differed between new users and current owners of Keurig. So the current owner of Keurig was obviously the one who had challenges with pod compatibility.
>
> There's really no way to go through a ***transition*** like this without going through those issues. So our plan has been, and continues to be, shorten the time the consumer feels that challenge and that pain. And you do that by moving through the inventory as quickly as you can, and by bringing in and welcoming in as many of the unlicensed brands as you can.
>
> There's really no way to do this ***transition*** without going through some of that. So our plan has been, and continues to be, shorten the time the consumer feels that challenge and that pain. ***And you do that by moving through the inventory as quickly as you can, and by bringing in and welcoming in as many of the unlicensed brands as you can.***
>
> ***But there's really no way to do this transition without some of that.***

(Emphasis added.)

100. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Again, the issues impacting Keurig's results were fixed in nature, not transitory. All of the Keurig 2.0 brewing systems in inventory at the time of this statement had Technological Malfunctions. Hence, the problem faced by Keurig was not merely one of increasing consumer portion pack options or phasing incompatible portion packs out of retail locations, it was a fixed problem that could only be solved by writing off millions of Keurig 2.0 brewing systems or selling them at a significant discount. Nevertheless, following the May 6, 2015 conference call analysts expressed their confidence that the problem faced by Keurig was transitory. For example, Canaccord Genuity ("Canaccord") stated, "We continue to believe that the challenges are not a permanent detriment to household penetration growth. The primary shortfall in Q2 was lower portion pack volume. . . ." Similarly, by July 2015, prior to the announcement of the Company's 2015 third fiscal quarter disappointing results, KeyBanc actually stated, "Brewer sales trends are starting to inflect supporting our thesis that issues plaguing brewer sales last holiday season were in fact

transitory and that brewer penetration has not reached a saturation point yet."

101. During the May 6, 2015, conference call, Defendant Kelley explained the deceleration of portion pack net sales as follows:

> ***And if we look at the lower pod volume, given that lower installed base, it really flows from there. When you don't get the installed base – particularly when you don't get it in the holiday season, which is when the brewers sell – you're going to have challenges.*** It's very difficult to make it up in the rest of the year.

(Emphasis added.)

102. The highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Although it is true that the Company's "installed base" grew more slowly than expected due to disappointing holiday sales, it is only half the truth. The disappointing holiday sales were themselves the natural and foreseeable result of consumers' unwillingness to purchase a defective machine. Accordingly, the lower pod volume referenced by Defendant Kelley occurred because the Keurig 2.0 brewing system was plagued by significant and unresolved Technological Malfunctions, which would have presented a barrier to sales regardless of the season.

**C. Additional Allegations that Defendants Made Their False and Misleading Statements with Scienter**

103. The facts alleged above and summarized below give rise to the strong inference that Defendants intentionally or with deliberate recklessness made the materially false and misleading statements and omissions alleged herein.

104. **First**, the introduction of the Keurig 2.0 and the transition away from the Keurig 1.0 were the intense focus of investor attention and concern. For example, in September 2014, KeyBanc predicted that the introduction of the Keurig 2.0 would help the Company increase its portion pack market share and added that: "[W]e maintain that it will be difficult for competitors to commercialize and legally produce 2.0-compatible portion packs and that they will find it difficult to keep up with future iterations of the Hot platform's operating system." KeyBanc also reported that "as the brewers

become 'smarter' and allow consumers to produce a wider variety of beverages at home with a greater degree of customization, we believe the brewers will likely become more attractive to consumers, thereby increasing [the Company's] long-term household penetration potential."

105. Following the launch of the Keurig 2.0, as Defendants reported declining sales of brewers, analysts continually asked Kelley and Rathke about problems with the transition and whether the Company was overcoming those problems. For example, in the November 19, 2014 conference call, a KeyBanc analyst inquired, "Brian, can you just talk a little bit about the sell-through [*i.e.*, retail sales] on 2.0 and how you're seeing it." By the February 4, 2015 conference call, analysts' questions indicated increasing concern, and a KeyBanc analyst pointedly asked, "are there any signs that you can point to that tell you that [decreased brewer sales and increased levels of inventory] are, in fact, transitory issues?" By the May 6, 2015 conference call, analysts' questions had begun to focus on the inventory and sell-through issues, and a Goldman Sachs analyst asked, "Brian I guess maybe just a little bit of color on the point-of-sales trend . . . [a]nd then as you think about the inventory positioning exiting the second quarter, can you give us some sense of how much is left to get that cleaned out?"

106. Thus, Defendants had strong motivations to learn about and understand any material problems with the Keurig 2.0, including but not limited to the Technological Malfunctions and their repercussions—for example, the declining sell-through at retailers and the inventory build-up.

107. **Second**, Defendants themselves emphasized the importance of a successful transition from the Keurig 1.0 to the 2.0, and this transition was the focus of their own statements to investors. During each quarterly conference call during the Class Period, Kelley and Rathke reported on the status of the transition. In the face of declining brewer systems sales, they repeatedly reassured investors that the problems were merely "transitory" and minimized any problems with the Keurig 2.0. For example, in the February 4, 2015 conference call, in response to an analyst's question, Defendant Kelley provided the following assurances: "So we know that [consumer

complaints are] a transitory issue. That's going to resolve itself. And it's going to resolve itself with some speed over time. . . ." Similarly, in the May 6, 2015 conference call, Defendant Kelley again assured analysts that the consumer complaints and declining brewer sales were part of a transition, and that "there's really no way to go through a transition like this without going through those issues."

108. Yet, while Kelley and Rathke were making these reassurances, they made a host of false and misleading statements and omissions that disguised the true magnitude of the underlying problems. Either Kelley and Rathke possessed the detailed personal knowledge of the Keurig 2.0's problems that they claimed to have, in which case they knew their statements were fraudulent, or they lacked personal knowledge about the Keurig 2.0's problems, in which case their repeated statements on the subject were deliberately reckless at a minimum.

109. **Third**, throughout the Class Period, Kelley and Rathke received information that alerted them to the true problems with the Keurig 2.0, including but not limited to the Technical Malfunctions. FE-1, who managed a cross-functional team that worked from concept to production launch on developing the Keurig 2.0 brewing system and was the point person from business plan to launch, reported to the Director of Technology, Jim Lewicki, who reported to the Chief Technical Officer, Kevin Sullivan, who reported to Kelley daily. Unsurprisingly, given the importance of the product launch, the Company had frequent meetings on the development of the Keurig 2.0 that were attended by senior leadership, including Sullivan, who reported directly to Kelley. Through these channels, Company personnel who were leading the development of the Keurig 2.0 raised concerns about the Technological Malfunctions and objected that a product launch in August 2014 was premature. Despite these well-informed objections, Kelley directed the Company to launch the Keurig 2.0 anyway, including the ill-advised production of several million highly flawed brewing systems.

110. After the introduction of the product in August 2014 and throughout the Class Period,

the Company maintained a consumer service phone-line, and consumers regularly called the line seeking assistance with the Keurig 2.0 brewing system. The Company also tracked the call center data, and tracked and analyzed consumer ratings on an ongoing basis. Additionally, the Company held weekly meetings concerning the decreasing brewer and accessory net sales and consumer complaints, and it generated internal reports depicting these decreasing sales and consumer complaints, which were passed on to Kelley. Given that both Kelley and Rathke had access to these reports and each of them made detailed statements to investors about the Keurig 2.0, including but not limited to its sales, customer response, and inventory, it would have been deliberately reckless of Kelley and Rathke not to have actually reviewed the reports.

111. **Fourth**, Defendants' materially false and misleading statements and omissions regarding the launch of the Keurig KOLD establish of pattern of Defendants' wrongdoing. Prior to the Class Period, on February 5, 2014, Keurig announced the introduction of the KOLD, a product designed to allow consumers to create their own iced teas, sports drinks, seltzers, flavored waters, and carbonated fountain drinks at home and in the workplace. To develop the pods for use with the KOLD, Keurig partnered with the Dr. Pepper Snapple Group and The Coca-Cola Company.

112. Like with the Keurig 2.0, Defendants emphasized the importance of the Keurig KOLD to the Company. On November 19, 2014, during the Company's quarterly conference call, Kelley stated: "[T]he long-term growth potential for Keurig [KOLD] in both North America and globally is significant. The cold beverage categories are more than 4 times the size of the hot beverage categories and consumer interest in this innovation is strong. . . . We expect that Keurig [KOLD] will grow its installed base at a faster rate than our hot platform given the strength and awareness of the Keurig brand versus 1998 when we launched our hot system; and we also believe it will globalize faster. Accordingly, on February 9, 2015, Trefis characterized the Keurig KOLD as the "highlight of 2015" and reported that "Keurig's most important objective of 2015 is the successful launch of Keurig

[KOLD] in North America."

113. Throughout the Class Period, Defendants falsely represented that the KOLD was "on track" and "on target" to be introduced to the market in the Fall of 2015. During the conference call on November 19, 2014, Kelley stated: "We are well on target to launch in the fall of 2015, well in time for the holiday season. We are on track with our product development efforts, including brewer technology, the manufacturing of pods and appliances, and all of the brand development required, including our own brands and partner brands." Although during November 19 call, Rathke disclosed that the Company's guidance for the entire fiscal year 2015 "factor[ed] in minimal revenue" from the KOLD, during the subsequent conference call on February 4, 2015, she said that the KOLD would have a "much more meaningful" contribution to fourth-quarter revenue—which was entirely consistent with a full launch in the Fall of 2015. During the same call, Kelley added, "Our plans are progressing well, and we're on track to launch this fall." And during the conference call on May 6, 2015, Kelley reiterated that the launch of the KOLD was "on track for the Fall of 2015."

114. Just eight days after the May 6, 2015 call, during which Kelley reiterated a Fall 2015 launch, on May 14, 2015, the Company announced the delay of the introduction of the Keurig KOLD. Specifically, Keurig announced that the Keurig KOLD would have a phased-in launch that would involve minimal sales in the Fall of 2015. The KOLD would be available for sale only on the Company's website in the Fall of 2015, then it would launch in select retailers in certain metropolitan areas in time for the 2015 holidays, and it would not reach full national retail distribution until the 2016 holiday season.

115. Defendants' statements about the KOLD launch being "on target" and "on track" for the Fall of 2015 were materially misleading because Defendants failed to qualify such statements by disclosing that it would be a phased-in launch with minimal sales in the Fall of 2015, rather than a full launch. Based on the Company's recent history, investors had good reason to believe that Defendants

meant a full launch. Although the Company launched the Keurig 2.0 on its website and at its flagship store on August 24, 2014, it became available at national retail partners less than one month later, in September 2014. Rathke's statement that the KOLD would have a "much more meaningful" contribution to fourth-quarter revenue reinforced the implication of a full launch. As an analyst at William Blair stated, investors expected millions of KOLD units to be sold within the first year of its launch, not hundreds of thousands.

116. It is simply implausible that, throughout the Class Period, when Defendants represented that the KOLD was "on track" for a Fall of 2015 launch, they did not know that the KOLD was actually "on track" for a phased-in launch and would have minimal sales in the Fall of 2015. A phased-in launch cannot occur at the last minute or on a whim. It must be carefully planned with distribution and retail partners—*e.g.*, selecting the retailers and geographic areas, reaching agreement with those retailers, coordinating logistics for distribution, etc. And it would be absurd for Defendants not to have known of the phased-in launch by the time Kelley reiterated the timing on May 6, 2015, just eight days before the phased-in launch was announced.

**D. The Revelation of the Truth About the Keurig 2.0**

117. The truth that had been concealed by Defendants' fraudulent statements about the Keurig 2.0 was revealed on the last day of the Class Period, August 5, 2015. On that day, investors learned that the issues with the Keurig 2.0 were not transitory at all but a devastating failure of execution that were having a profoundly negative on the Company's financial performance.

118. After the market close, Keurig issued a press release titled, "Keurig Green Mountain Reports Third Quarter 2015 Results." At this time, the Company also filed its quarterly report with the SEC on Form 10-Q for the fiscal third quarter. For the fiscal third quarter, the Company reported disappointing results, including but not limited to a 26% decline in Keurig brewer and accessory sales, a 1% decline in pods sales, and a 5% decline in overall net sales revenue compared to the prior year

period. This was the first quarter since the introduction of the Keurig 2.0 in which the Company experienced a decline in pod sales. In its Form 10-Q, the Company reported an $18 million write-off of Keurig 2.0 brewing systems inventory purportedly due to "obsolescence." The Company was also forced to update its outlook for fiscal year 2015, lowering its predicted revenue growth to a decline of low-single to mid-single digits compared to fiscal year 2014.

119. The Company maintained that its net sales were below expectations due in large part to lower installed base growth, brewer unit sales below expectations, and high promotional levels used to clear inventory. These disappointing results revealed, for the first time, the full magnitude of the entrenched and persistent problems associated with the Keurig 2.0 brewing systems, as well as the corresponding decline in portion pack sales.

120. Also after the market close on August 5, 2015, the Company filed its quarterly report with the SEC Form 10-Q for the fiscal third quarter. Defendants Kelley and Rathke also held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release and the Form 10-Q.

121. During the August 5, 2015 conference call, Kelley described the Technological Malfunctions associated with the Keurig 2.0:

> [W]e have seen higher returns on 2.0. Initially, we saw higher returns. And we're clear on what drove those returns. Early on, it was about the compatibility. And then as we moved from compatibility, it became there's what some call a clogged needle. In reality, the clogged needle exists both on 1.0 and 2.0 at about the same level. But what the 2.0 did differently, the brew engine and the algorithm is different.
>
> And so if you were a consumer who had a Keurig prior and you got a new one, in some cases, in some locations with some pods, it would change the way it brewed. And so you might have thought that that was something that was different and you didn't like it and so consumers brought it back.
>
> And so those were the two things that drove that increase in returns… We put changes in place in the 2.0 brewers that get resolved, that resolve this problem. In certain models, they roll out at different times. But yes, we have made the changes necessary to have the consumers see a brew algorithm that looks much more like the

1.0.

122. During the August 5, 2015 conference call, Kelley also described the promotions the Company implemented to move through stagnant inventory:

> Brewer volumes were down 18% in the quarter, as we continue to work through the high levels of inventory at retail on reservoir brewers and experienced lower sales of MINI brewers, as we continue to restock that product at retailers. Brewer price realization declined in the quarter, due to investments we made in brewer promotions to work through inventory.
>
> Brewer net price realization decline 6%, as we had higher promotional levels in an effort to clear inventory.

123. Finally, during the August 5, 2015 conference call, Rathke reported an $18 million write-off of Keurig 2.0 brewing systems inventory due to "obsolescence" of finished goods and stated:

> I think we mentioned the write down of some of the brewers in the quarter. And I think that was essentially helping us be well positioned for this holiday with the right amount of brewers, both on our balance sheet and also to help ensure our customers have a good holiday POS quarter.

124. In response to these disclosures, on August 6, 2015, Keurig's stock price fell $22.31 per share, or nearly 30%, to close at $52.67 per share, on usually heavy trading volume.

## VI. LOSS CAUSATION

125. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

126. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and other Class members. During the Class Period, Plaintiffs and other Class members purchased or acquired Keurig securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly when information disclosed to the market for the first time corrected those material misrepresentations and omissions.

127. Prior to May 14, 2015, Defendants had misled investors regarding the delayed launch of the Keurig KOLD. Investors learned the truth, when, after the market close on May 14, 2015,

Keurig held a webcast for investors and analysts unveiling the Keurig KOLD machine and announcing that it would not reach full national retail launch until the 2016 holiday season. In reaction to Keurig's announcement, during the next trading day on May 15, 2015, the market drove down the value of Keurig's shares. Its stock declined more than 8.5% to a closing price of $93.91, a drop of $8.79 on usually heavy trading volume.

128. Before the end of the Class Period, Defendants also misled investors regarding the systematic Technological Malfunctions affecting the Keurig 2.0, the poor quality of its inventory, and the impact these problems would have on the Company's financial performance.

129. Investors learned the truth about the repercussions of the ongoing and entrenched problems associated with the introduction of and transition to the Keurig 2.0, and their repercussions, on August 5, 2015, the last day of the Class Period. After the market close, Keurig announced its 2015 third fiscal quarter results. As a result of the unresolved Technological Malfunctions, brewer sales continued to decline during the third fiscal quarter, and, for the first time since the introduction of the Keurig 2.0, pod sales declined as well. Specifically, brewer and accessory sales declined 26%, pods sales declined 1%, and overall net sales declined 5% compared to the prior year period. Additionally, the Company reported non-GAAP adjusted operating income decline of 28% and GAAP adjusted operating income decline of 30%. The Company was also forced to update its outlook for fiscal year 2015, lowering its predicted revenue growth to a decline of low-single to mid-single digits compared to fiscal year 2014. These hugely disappointing financial results were the materialization of the risk concealed by Defendants' misstatements – the premature launch of the Keurig 2.0 and resulting Technical Malfunctions.

130. Further, on August 5, 2015, Defendants disclosed that the Keurig 2.0 brewing system had been suffering from a clogged needle malfunction, and that the higher sales returns of the Keurig 2.0 were due, at least in part, to the clogged needle. Defendants also disclosed that the Company took

an $18 million write-off of Keurig 2.0 brewing systems inventory purportedly due to the "obsolescence" of finished goods. Further, the Defendants disclosed that brewer net price realization declined 6% due to promotional programs implemented to lower inventory levels. These disclosures corrected Defendants' misstatements and omissions.

131. The market was astonished by these disclosures. For example, SunTrust issued an analyst report titled, "Worse Than (Even We) Expected; Weak F3Q/Guidance," in which it reported that "[w]hile we were not surprised by the guide down, the current state of affairs was much worse than expected." Under the heading, "3Q Disappoints, Let Us Count the Ways," SunTrust reported that Keurig missed its estimates in total revenue, pod revenue, and gross margin. SunTrust also reported that "[t]he real surprise was the pod revenue decline." In addition, Susquehanna issued an analyst report titled, "Keurig Green Mountain: Crisis of Confidence (Downgrading to Neutral)," in which it reported: "We put too much focus on the growth opportunity and the strength of the franchise, and not enough on the company's own execution and the lack of a sound strategic response to the various (although natural and expected) market challenges." Susquehanna further reported that "[t]he quarter disappointed in all the key metrics," and that "the miss [in brewer revenues] combined with sales guidance for low teens-growth for 4Q15 implies the brewer problems are far from over." Analysts at Susquehana, Canaccord, and Morgan Stanley all downgraded Keurig's stock in light of Defendants' disclosures.

132. In reaction to Defendants' corrective disclosures, during the next trading day on August 6, 2015, the Company's stock plummeted nearly 30% to a closing price of $52.67, a drop of $22.31 on unusually heavy trading volume.

## VII. PRESUMPTION OF RELIANCE

133. At all relevant times, the market for Keurig's securities was efficient for the following reasons, among others:

(a) Keurig's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regular issuer, Keurig filed periodic reports with the SEC and NASDAQ;

(c) Keurig regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Keurig was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain of their customers.

134. As a result of the foregoing, the market for Keurig stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price. Under these circumstances, all purchasers of Keurig securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices, and a presumption of reliance applies.

135. In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 496 U.S. 128 (1972), because the claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

136. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements pleaded in this Complaint.

137. None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Keurig 2.0 and the Keurig KOLD.

138. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary

language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Keurig 2.0 and the Keurig KOLD. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Keurig were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

139. To the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, either the speaker knew that the statement was false or the statement was approved by an executive officer of Keurig who knew that the statement was false.

## IX. CLASS ACTION ALLEGATIONS

140. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Keurig securities traded on the NASDAQ from November 19, 2014, through August 5, 2015, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Keurig at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

141. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Keurig common shares were actively traded on NASDAQ. As of November 14, 2014, Keurig had 162,009,539 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members. Class members who purchased Keurig common shares may be identified from records maintained by the Company or its transfer agents, and such members may be notified of this class action using a

form of notice similar to that customarily used in securities class actions.

142. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

143. Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

144. Common questions of law and fact exist to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Keurig 2.0 or the Keurig KOLD;

(c) whether Defendants acted with scienter; and

(d) to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

145. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## X. CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants Keurig, Kelley, and Rathke

146. Plaintiff repeats and realleges each and every allegation set forth above as if fully set

forth herein.

147. This Count is asserted on behalf of all members of the Class against Defendants Keurig, Kelley, and Rathke for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

148. During the Class Period, Defendants knowingly or recklessly made untrue statements of material fact and omitted to state material facts necessary to make their statements made, in the light of the circumstances under which they were made, not misleading. These misrepresentations and omissions: (i) deceived the investing public, including Plaintiff and the Class, regarding, among other things, the Technological Malfunctions plaguing the Keurig 2.0 brewing system and its introduction to the market; (ii) artificially inflated and maintained the market price of Keurig securities; and (iii) caused Plaintiffs and other members of the Class to purchase Keurig securities at artificially inflated prices and suffer losses when the true facts became publicly known.

149. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged in a course of conduct that operated as fraud on Plaintiffs and the Class. The facts alleged herein give rise to a strong inference that Keurig and each of the Individual Defendants made materially false and misleading statements and omissions with scienter. They knew or recklessly disregarded that the Class Period statements alleged herein contained material misrepresentations and omissions.

150. Keurig is liable for all materially false and misleading statements and omissions made during the Class Period, including such statements and omissions made during the following Keurig conference calls:

(a) 4Q 2014 Earnings Call on November 19, 2014;

(b) 1Q 2015 Earnings Call on February 4, 2015;

(c) 2Q 2015 Earnings Call on May 6, 2015; and

(d) 3Q 2015 Earnings Call on August 5, 2015.

151. Kelley is liable for the materially false and misleading statements and omissions he made during the Class Period, including such statements and omissions made during the following Keurig conference calls:

(a) 4Q 2014 Earnings Call on November 19, 2014;

(b) 1Q 2015 Earnings Call on February 4, 2015;

(c) 2Q 2015 Earnings Call on May 6, 2015; and

(d) 3Q 2015 Earnings Call on August 5, 2015.

152. Rathke is liable for the materially false and misleading statements and omissions she made during the Class Period, including such statements and omissions made during the following Keurig conference calls:

(a) 4Q 2014 Earnings Call on November 19, 2014;

(b) 1Q 2015 Earnings Call on February 4, 2015;

(c) 2Q 2015 Earnings Call on May 6, 2015; and

(d) 3Q 2015 Earnings Call on August 5, 2015.

153. Plaintiffs and other Class members have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Keurig securities, which inflation was removed from the stock when the true facts became known. Plaintiffs and other Class members would not have purchased Keurig securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' material misrepresentations and omissions.

154. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members suffered damages attributable to the fraud alleged herein in connection with their purchases or acquisitions of Keurig securities during the Class Period.

## COUNT II

**Violations of Section 20(a) of the Exchange Act
Against Individual Defendants Kelley and Rathke**

155. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

156. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

157. During their tenures as officers and/or directors of Keurig, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Keurig, they had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. They were able to and did control, directly and indirectly, the content of the public statements made by Keurig during the Class Period, thereby causing the dissemination of the material misrepresentations and omissions alleged herein.

158. In their capacities as senior corporate officers of Keurig, the Individual Defendants had direct involvement in the daily operations of the Company; in reviewing and managing its regulatory and legal compliance; and in its accounting, reporting, and public disclosure functions. They made the false and misleading statements alleged herein. Accordingly, the Individual Defendants, as a group and individually, were controlling persons of Keurig within the meaning of Section 20(a) of the Exchange Act.

159. Keurig is a primary violator of Section 10(b) and SEC Rule 10b-5 by its acts and omissions alleged herein. By virtue of their positions as controlling persons of the Company and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a), jointly and severally with and to the same extent as the Company is liable under Section 10(b)

and Rule 10b-5, to Plaintiff and other Class members who purchased or otherwise acquired Keurig securities.

160. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of Keurig securities during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b) awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d) awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 6, 2015

GLANCY PRONGAY & MURRAY LLP

By: *s/ Joshua Crowell*

Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

THE ROSEN LAW FIRM, P.A.
Phillip C. Kim (*pro hac vice*)
275 Madison Avenue, Suite 3400
New York, New York 10116
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: info@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On November 6, 2015, I served the following document:

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as listed on the attached Court's ECF Service List.

And on any non-ECF registered parties:

By U.S. Mail: By placing true and correct copies thereof in individual sealed envelope: with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence or mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 6, 2015, at Los Angeles, California.

*s/ Joshua L. Crowell*
Joshua L. Crowell

# Mailing Information for a Case 3:15-cv-02766-VC Blasco v. Keurig Green Mountain, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randall W. Bodner**
  randall.bodner@ropegray.com
- **Solomon B. Cera**
  scera@cerallp.com,keg@cerallp.com,jrl@cerallp.com,lakessler@cerallp.com
- **Joshua L Crowell**
  jcrowell@glancylaw.com
- **Anne Johnson Palmer**
  anne.johnsonpalmer@ropesgray.com,courtalert@ropesgray.com
- **Phillip C Kim**
  pkim@rosenlegal.com
- **Ronald Scott Kravitz**
  rkravitz@kravitzesq.com,rkravitz@sfmslaw.com,pleadings@sfmslaw.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Robert Scott McWhorter**
  robert.mcwhorter@leclairryan.com,dana.bardon@leclairryan.com,amy.smith@leclairryan.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Daniel B. Rehns**
  drehns@cohenmilstein.com,efilings@cohenmilstein.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Kevin Francis Ruf**
  info@glancylaw.com,egonsiorowski@glancylaw.com,kevinruf@gmail.com,cturner@glancylaw.com
- **Daniel S. Sommers**
  dsommers@cohenmilstein.com,efilings@cohenmilstein.com
- **Steven J. Toll**
  stoll@cohenmilstein.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)