GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Joshua L. Crowell (#295411)
Alexa J. Mullarky (#307932)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

THE ROSEN LAW FIRM, P.A.
Phillip C. Kim (*pro hac vice*)
275 Madison Avenue, Suite 3400
New York, New York 10116
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD BLASCO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC., BRIAN P. KELLEY, and FRANCES G. RATHKE,<br><br>Defendants. | Case No. 3:15-cv-02766-VC<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ........ 1

II. JURISDICTION AND VENUE ........ 5

III. PARTIES ........ 5

IV. BACKGROUND ........ 6

- A. Keurig's Business ........ 6
- B. The Keurig 2.0 ........ 8
- C. The Keurig KOLD and Keurig MINI ........ 10
- D. Keurig Former Employee Witnesses ........ 11

V. DEFENDANTS' FRAUDULENT CONDUCT ........ 12

- A. Overview of the Fraud ........ 12
- B. The Keurig 2.0 Suffered from Material and Known Product Malfunctions that Went Unresolved at Least Through the End of the Class Period ........ 13
  - 1. The Product Malfunctions Were Material and Known Design Defects ........ 14
    - a) The Clogged Needle Defect ........ 15
    - b) The Bursting and Spraying Pod Defect ........ 18
  - 2. The Company Identified the Product Malfunctions Before the Start of the Class Period and Failed to Cure Them by the End of the Class Period ........ 19
  - 3. The Keurig 2.0 Debuted with Low Consumer Approval Ratings and Experienced High Rates of Sales Returns; Keurig Was Aware of Poor Consumer Approval Ratings ........ 24
  - 4. The Product Malfunctions Were a Cause of the Deceleration and Eventual Decline of Portion Pack Net Sales ........ 26
  - 5. High Levels of Inventory and Dissatisfaction on Behalf of Retailers and Distributors ........ 28
  - 6. Kelley's and Rathke's Personal Involvement in the Introduction of and Transition to the Keurig 2.0 ........ 29

C. Defendants Materially Misrepresented the Magnitude of the Problems Associated with the Introduction of and Transition to the Keurig 2.0 .................. 31

1. 2014 Fourth Fiscal Quarter and 2014 Fiscal Year Financial Results ........ 31

2. 2015 First Fiscal Quarter Financial Results ............................................. 35

3. 2015 Second Fiscal Quarter Financial Results ......................................... 39

D. Additional Allegations that Defendants Made Their False and Misleading Statements with Scienter .......................................................................... 41

E. The Revelation of the Truth About the Keurig 2.0 .............................................. 47

VI. LOSS CAUSATION ........................................................................................... 49

VII. PRESUMPTION OF RELIANCE ...................................................................... 51

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................................................ 52

IX. CLASS ACTION ALLEGATIONS ..................................................................... 53

X. CLAIMS FOR RELIEF ....................................................................................... 55

XI. PRAYER FOR RELIEF ...................................................................................... 58

XII. JURY DEMAND ................................................................................................ 58

1. Lead Plaintiffs Jessica Lee, Alan Schlussel, and Lawrence E. Wilder (collectively "Plaintiffs"), by and through their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Keurig Green Mountain, Inc. ("Keurig" or the "Company") from November 19, 2014, through August 5, 2015, inclusive (the "Class Period").

2. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP and The Rosen Law Firm, P.A. This investigation included, among other things, a review and analysis of: (i) Keurig's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Keurig's investor calls; (vi) interviews with former employees and other potential witnesses with relevant information; and (vii) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

3. During the Class Period, Defendants Keurig, its Chief Executive Officer ("CEO") Brian Kelley ("Kelley"), and its Chief Financial Officer ("CFO") Frances G. Rathke ("Rathke") (collectively, "Defendants") made numerous materially false and misleading statements and omissions concerning the problems associated with the introduction of and transition to the Keurig 2.0, a

proprietary brewing system that makes coffee and other hot beverages using portion packs or pods.

4. Introduced to the market in August 2014, the Keurig 2.0 was touted as a "breakthrough innovation" that allowed users to brew various portion sizes, including a single-cup and a four-cup carafe. Additionally, the Keurig 2.0 was the first Keurig brewer to incorporate Digital Rights Management ("DRM") technology, which enabled the Keurig 2.0 to read the ink on a pod's lid, identify the portion size of the pod, and provide the consumer with a choice of recipes based upon this identification. The Company announced the transition from its largely successful Keurig 1.0 to the Keurig 2.0 and its intention to replace the Keurig 1.0 within approximately one year of the launch of the Keurig 2.0. Investors hoped that the enhanced features of the Keurig 2.0 would achieve greater household penetration for Keurig brewers, leading to increased sales of portion packs, which is where the Company derives its profits. Given the Product Malfunctions with the 2.0, this transition was bound to fail.

5. Defendants concealed from investors that the Keurig 2.0 suffered from design flaws that caused certain product malfunctions, which included: (i) clogged brewing needles, resulting in the brewing process shutting down, brewing less coffee than desired, and/or grounds being deposited in the coffee; (ii) bursting pods, resulting in grounds and hot water spraying out of the brewer; and (iii) failure of the pump system, which is interrelated to the clogged needle defect (collectively, the "Product Malfunctions"). The Product Malfunctions were identified during consumer and lab testing prior to the launch of the Keurig 2.0 and identified in consumer complaints throughout the Class Period. Indeed, the entire inventory of 4.5 million Keurig 2.0 brewing systems produced in anticipation of the August 24, 2014 launch had the same propensity for exhibiting the Product Malfunctions.

6. The Product Malfunctions were material. According to an independent analysis conducted by Plaintiffs' counsel, of the 8,062 ***total*** consumer reviews posted to the Amazon, Staples,

and *Consumer Reports* websites from August 24, 2014 through August 5, 2015, 5.0% explicitly referenced one or more of the Product Malfunctions, and of the 2,536 ***critical*** reviews posted to the same websites during the same period, 16% explicitly referenced one or more of the Product Malfunctions. *See* Declaration of Joshua L. Crowell, filed concurrently herewith ("Crowell Decl."), at Exh. 1. With respect to the clogged needle defect specifically, a former well-placed employee states that approximately 2% of ***all*** consumers who purchased a Keurig 2.0 affirmatively registered a complaint with the Company about clogged needles, and that this defect occurred at a far higher rate on the Keurig 2.0 than the Keurig 1.0. Consumers have complained that clogs occurred at least once per week. With respect to the bursting and spraying pod defect, another well-placed former employee who conducted hundreds of demonstrations during the Class Period states that the defect occurred as often as once every 25 brews. Consumers have complained about hot water spraying out of the system along with coffee grounds, showing that this defect is as dangerous as it is messy.

7. As consumer complaints and reviews demonstrated, the Product Malfunctions occurred at a significant frequency so as to cause widespread consumer dissatisfaction with the quality of the Keurig 2.0. The Product Malfunctions thus endangered one of the Company's primary goals for launching the Keurig 2.0 – achieving greater household penetration for its brewing systems. Even for those who did purchase the Keurig 2.0, the Product Malfunctions discouraged them from using the product. Ultimately, the Product Malfunctions negatively impacted the Company's portion pack sales, the primary driver of the Company's profit margins. In response to this problem, the Company tried – and failed – to cure the Product Malfunctions during the Class Period. Instead, the Company provided jerry-rigged "solutions" to consumers – such as suggesting use of paper clips to unclog the needles – that only underscored the deficient quality of its product.

8. As demonstrated by, *inter alia*, the Company's pre-launch product testing, tracking of consumer complaints and reviews, and efforts to resolve or at least ameliorate the Product

Malfunctions, Defendants were fully aware that the Product Malfunctions were material. Nonetheless, throughout the Class Period, Defendants knowingly or with deliberate recklessness made materially false or misleading statements and omissions to downplay the Company's disappointing launch and transition to the Keurig 2.0. In sum, Defendants misled investors by: (1) failing to disclose the existence of the Product Malfunctions; (2) falsely reassuring investors that disappointing sales were not caused by a failure of "execution," that the quality of the brewing systems was "excellent," and that there was "very, very little disappointment" with the brewers; and (3) falsely attributing disappointing sales solely to "transitory" and "conversion" issues about old pod inventory and compatibility constraints, while omitting the less temporary problems posed by the unresolved Product Malfunctions.

9. Throughout the Class Period, the unresolved Product Malfunctions continued to repel consumers, thereby negatively impacting sales of brewers and portion packs. It was not until after the market close on August 5, 2015, that the truth of Defendants' misrepresentations and omissions was revealed to the market. At this time, Keurig reported disappointing results for the third quarter of 2015, including a 26% decline in Keurig brewer and accessory net sales, and, for the first time since the introduction of the Keurig 2.0, declines in pods sales (1%) and overall net sales revenue (5%). In addition, the Company reported an $18 million write-off of Keurig 2.0 inventory. The Company was forced to update its outlook for fiscal year 2015, lowering its predicted revenue growth to a decline of low-single to mid-single digits compared to fiscal year 2014. Finally, Defendants acknowledged that the Keurig 2.0 brewing system had a clogged needle defect, and that it was driving higher sales returns for the brewer.

10. These disclosures caught the market by surprise. For example, SunTrust Robinson Humphrey ("SunTrust") reported that "the current state of affairs was much worse than expected." In reaction to Defendants' disclosures on August 5, 2015, during the next trading day on August 6, 2015,

the Company's stock price plummeted $22.31 per share – nearly 30% – on heavy trading volume, to close at $52.67 per share. The revelation of Defendants' fraud obliterated billions of dollars of the Company's market capitalization.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

12. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Keurig conducts business and maintains a production facility in this District.

14. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

15. On September 28, 2015, the Court appointed Jessica Lee, Alan Schlussel, and Lawrence E. Wilder as Lead Plaintiffs. Plaintiffs purchased Keurig common stock during the Class Period and suffered damages as a result of the violations of federal securities laws alleged herein. Plaintiffs' PSLRA certifications previously filed with the Court are incorporated by reference.

16. Defendant Keurig is a Delaware corporation with its primary executive offices in Waterbury, Vermont, and its production and distribution facilities in California, Tennessee, Vermont, Virginia, Washington, and Canada. The Company operates primarily in the United States and

Canada.[1] Throughout the Class Period, Keurig common stock was actively traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol GMCR.

17. In December 2015, Keurig announced that a group of investors led by JAB Holding Co. would acquire it for $13.9 billion in cash. The acquisition closed in March 2016. Keurig is now a privately held company, though it is still run by the same management team.

18. Defendant Kelley was, at all relevant times, CEO and President of Keurig and a member of its Board of Directors. Kelley joined the Company in December 2012. Throughout the Class Period, Kelley made materially false and misleading statements on conference calls with investors and analysts.

19. Defendant Rathke was, at all relevant times, the CFO and Treasurer of Keurig. On November 19, 2014, the Company announced that she would leave the Company no later than September 26, 2015. Rathke joined the Company in October 2003. Throughout the Class Period, Rathke made materially false and misleading statements on conference calls with investors and analysts.

20. Defendants Kelley and Rathke are collectively referred herein as the "Individual Defendants."

## IV. BACKGROUND

### A. Keurig's Business

21. The Company develops, produces, and sells Keurig proprietary beverage brewing systems; coffee, hot cocoa, teas, and other beverages under various brands in portion packs for use in its Keurig brewing systems; and bagged coffee beans and ground coffee. Through its own and its partnership licensed brands, the Company offers over 400 different varieties of coffee and other beverages. Keurig sells many of its beverage varieties in single-serve pods called "K-Cups," in four-

[1] In fiscal year 2014 Keurig expanded outside of North America by launching a brewer in the United Kingdom; and in its November 19, 2014, Form 10-K Keurig announced its plans to continue to launch brewers in targeted countries outside of North America during fiscal year 2015.

cup carafe pods called "K-Carafes," and in other types of pods.

22. Keurig's hot brewing system prepares a beverage by piercing the foil seal of the pod with spray needle(s) while piercing the bottom of the plastic pod with discharge needle(s). Grounds contained inside the pod are in a paper filter. Hot water is forced under pressure through the pod, passing through the grounds and through the filter. In this way, Keurig's brewing system turns ground coffee into brewed coffee in under a minute.

23. As noted by analysts at UBS Securities LLC ("UBS"), the Company "employs a 'razor and blade' model, selling brewers roughly at cost and replenishable K-Cups at a margin-accretive mark up." Similarly, analysts at Roth Capital Partners explained that, "[a]n increased installed brewer base translates to increased portion pack consumption, which is where the company's profits are derived in its razor/blade business model."

24. Keurig partners with various coffee and beverage brands. On November 19, 2014, Keurig reported that it offered more than 385 beverage varieties and over 50 brands as part of the Keurig system. Portion packs are produced and sold by Keurig and/or Keurig partners ("licensed portion packs"), but may also be produced and sold by unlicensed Keurig competitors ("unlicensed portion packs"). These unlicensed portion packs became legally available after two key Keurig patents expired on September 16, 2012. However, the portion pack market is dominated by Keurig and its partners. On February 4, 2015, Keurig estimated that the market share of unlicensed portion packs was approximately 10% to 11% and would be single digits by the end of 2015.

25. The Keurig brewing systems developed and sold by Keurig are produced primarily in China and Malaysia by third-party manufacturers. An Asia-based research, development, and quality control function provides manufacturing oversight, project management, and quality support. Every authorized distributor of Keurig brewing systems is bound by an annual Keurig Authorized Distributor ("KAD") Agreement. Under the terms of the KAD Agreement, each authorized distributor is required

to sell a certain number of Keurig brewers to retain their KAD status.

26. Keurig sales teams market and sell Keurig beverages and brewing systems to retailers including supermarkets, department stores, mass merchandisers, club stores, and convenience stores; to restaurants, hospitality accounts, office coffee distributors, and partner brands; and to consumers directly through Keurig's website. Keurig divides its sales teams into teams focused on "At Home" products (the "AH channel") and teams focused on "Away From Home" products (the "AFH channel"). In the AH channel, Keurig targets individual coffee drinkers, and promotes their brewing systems primarily through mass merchants, specialty and department store retailers, select wholesale clubs, and the Company's website; as well as through regionally targeted and national television advertising. Keurig sales teams work closely with retailers on product plans, marketing programs, and other sales support. In the AFH channel, Keurig targets the office coffee channel, as well as food service and hospitality accounts. Keurig relies on a selective, but non-exclusive, network of distributors in the AFH channel, ranging in size from local to national distribution companies.

**B. The Keurig 2.0**

27. On January 29, 2014, prior to the Class Period, Keurig announced the introduction of a new brewing system, the Keurig 2.0. The Keurig 2.0 was touted as a "breakthrough innovation" that allowed users to brew both a single-cup of coffee and up to a four-cup carafe. Keurig intended to transition from the Keurig 1.0 to the Keurig 2.0, thereby replacing the Keurig 1.0 within approximately one year after the launch of the Keurig 2.0. During the 2014 holiday season and into 2015, Keurig continued to ship both the Keurig 1.0 and 2.0 brewing systems, but marketing and merchandising was focused almost exclusively on the Keurig 2.0. As KeyBanc Capital Markets ("KeyBanc") reported, the Keurig 2.0 was critical to the Company's future business growth because the new model was expected to increase household penetration potential.

28. The Keurig 2.0 was the first Keurig brewer to incorporate DRM technology

(trademarked as "Keurig brewing technology"), which enabled the Keurig 2.0 to read the ink on a pod's lid, identify the type of pod, and provide the consumer with a choice of recipes based upon this identification. DRM technology also enabled the Keurig 2.0 to distinguish between licensed and unlicensed portion packs, as well as between Keurig 1.0 and Keurig 2.0 portion packs.

29. As a result of its DRM technology, the Keurig 2.0 was incompatible or less compatible with Keurig 1.0 portion packs; unlicensed portion packs; and the "My K-Cup" accessory, which had previously allowed consumers to brew the coffee of their choice on the Keurig 1.0, regardless of its brand. Consumers were therefore limited to purchasing licensed Keurig 2.0 compatible portion packs.

30. On August 24, 2014, prior to the Class Period, the Keurig 2.0 debuted on the Company's website, and it became available at national retail partners in September 2014. Upon its debut, the Keurig 2.0 experienced high rates of sales returns and suffered from low consumer approval ratings, in large part due to the Product Malfunctions and compatibility constraints. As detailed below, the Keurig 2.0's Product Malfunctions persisted throughout the Class Period. During this time, Keurig also lost more money on brewers than it had in the past owing to the higher cost of production for the Keurig 2.0. According to KeyBanc, the Keurig 2.0 costs approximately $15 more to produce than the Keurig 1.0.

31. During the Class Period, the Keurig 2.0 was widely available in three series: (i) the K300, K400, and K500; (ii) the K350, K450, and K550; and (iii) the K460 and K560. The K300-K500 brewers were sold with four K-Cups and two K-Carafes; the K350-K550 brewers were sold with six K-Cups and four K-Carafes; and the K460-K560 brewers were sold with 42 K-Cups and four K-Carafes, and were available at select stores only. The manufacturer's suggested retail price ("MSRP") ranged from $139.99 to $199.99, depending on the model and series. The K300 and the K350 – the lowest-priced model – featured a 60-ounce water reservoir, a grayscale touchscreen display, and nine brew sizes ranging from four to thirty ounces. The K400, K450, and K460 – the

mid-priced model – featured a 70-ounce water reservoir, a color touchscreen display, and nine brew sizes ranging from four to thirty ounces. The K500, K550, and K560 – the highest-priced model – featured a 80-ounce water reservoir, a large color touchscreen display, hot water on demand, and ten brew sizes ranging from four to thirty ounces.

32. The K200 and K250 were launched online in May 2015 and became available at select national retailers in Summer 2015. These models occupied a smaller countertop footprint and were offered in various colors. The MSRP of the K200 and K250 ranged from $119.99 to $129.99.

**C. The Keurig KOLD and Keurig MINI**

33. Prior to the Class Period, on February 5, 2014, Keurig announced the introduction of the Keurig Cold (later marketed as the "Keurig KOLD" or "KOLD"). The Keurig KOLD was touted as an "innovative, convenient way [for consumers] to freshly prepare their favorite cold beverages at the push of a button." More specifically, the Keurig KOLD was designed to allow consumers to create their own iced teas, sports drinks, seltzers, flavored waters, and carbonated fountain drinks at home and in the workplace. To develop the pods for use with the Keurig KOLD, Keurig partnered with the Dr. Pepper Snapple Group and The Coca-Cola Company.

34. Throughout the Class Period, Defendants represented that the KOLD was "on track" and "on target" to be introduced to the market in the Fall of 2015. Defendants also represented that the KOLD would be priced comparably to its hot brewing systems. Neither turned out to be true. On May 14, 2015, Keurig announced that instead of a full launch in the Fall of 2015, as everyone expected, the Keurig KOLD would have a phased-in launch. The KOLD would be available for sale only on the Company's website in the Fall of 2015, then be available in select retailers in certain metropolitan areas in time for the 2015 holidays, and not reach full national retail distribution until the 2016 holiday season. Moreover, the Company announced that the KOLD's price point – both for the unit and its pods – would be substantially higher than that of the hot brewing systems, leading many

analysts to predict that the KOLD would be prohibitively expensive for mainstream consumers.

35. Also during the Class Period, on December 23, 2014, Keurig issued a voluntary recall of the Keurig MINI due to burn hazards, thereby effectively removing Keurig's only sub- $100 brewing system from the market. The recall was conducted by the United States Consumer Product Safety Commission. In anticipation of the recall, Keurig ceased shipping Keurig MINI brewing systems in November and December 2014.

36. With the stalled introduction of the prohibitively expensive KOLD and the recall of the dangerous Keurig MINI, it was critical for the Company to have a successful transition from the Keurig 1.0 to the Keurig 2.0. Defendants already had two disappointing product lines on their hands, and the Company might not be able to withstand a third. Thus, Defendants were under tremendous pressure to conceal – or at least downplay – any problems with the Keurig 2.0.

### D. Keurig Former Employee Witnesses

37. Plaintiffs' allegations are supported by six former employee witnesses ("FEs"), each of whom was employed by Keurig during the Class Period.

38. FE-1, employed by Keurig from October 2011 through August 2015, was first a Senior Manufacturing Engineer, and was later promoted to Program Manager in Technology. FE-1 reported to Director of Technology Jim Lewicki, Director of Contract Manufacturing Louis Roth, and Senior Director of Manufacturing and Operations Greg Montemurro. FE-1 managed a cross-functional team that worked from concept to production launch on developing the Keurig 2.0 brewing system and the beverages for it. FE-1 was the point person from business plan to launch, responsible for staying on top of what everyone on the team was working on and providing senior leadership with updates.

39. FE-2, employed by Keurig from April 2012 through November 2014, was an Account Manager. FE-2 reported directly to Field Sales Manager Jackie Rios-Torchia and the National Director of Field Sales Independent Accounts Mike Williamson.

40. FE-3, employed by Keurig from November 2009 through April 2015, was an Area Sales Manager in California, Nevada, Utah, and Arizona. FE-3 reported directly to Regional Sales Manager David Mattice.

41. FE-4, employed by Keurig from July 2013 through December 2014, was the Vice President of Sales, Strategy and Planning. FE-4 reported directly to the President of U.S. Sales and Marketing John Whoriskey.

42. FE-5, employed by Keurig from August 2013 through August 2015, was an Industrial Engineer. FE-5 reported directly to Plant Engineer Manager Jim Halverson.

43. FE-6, employed by Keurig from September 2014 through September 2015, was Finance Manager, Strategy and New Product Development. Among other duties, FE-6 worked with analysts and forecasters to predict the financial metrics of new products, including the Keurig 2.0.

## V. DEFENDANTS' FRAUDULENT CONDUCT

### A. Overview of the Fraud

44. As detailed below, the Keurig 2.0 suffered from design flaws that caused certain Product Malfunctions, which included: (i) clogged brewing needles, resulting in the brewing process shutting down, brewing less coffee than desired, and/or grounds being deposited in the coffee; (ii) bursting pods, resulting in grounds and hot water spraying out of the brewer; and (iii) failure of the pump system, which is interrelated to the clogged needle defect. The Product Malfunctions were identified during consumer and lab testing prior to the launch of the Keurig 2.0 and identified in consumer complaints throughout the Class Period. Indeed, the entire inventory of 4.5 million Keurig 2.0 brewing systems produced in anticipation of the August 24, 2014 launch had the same propensity for exhibiting the Product Malfunctions.

45. As consumer complaints and reviews demonstrated, the Product Malfunctions occurred at a material frequency so as to cause significant consumer dissatisfaction with the quality of the product. The Product Malfunctions thus endangered one of the Company's primary goals for

launching the Keurig 2.0 – achieving greater household penetration for its brewing systems. Even for those who did purchase the Keurig 2.0, the Product Malfunctions discouraged them from using the product. Ultimately, the Product Malfunctions negatively impacted the Company's pod sales, the primary driver of the Company's profit margins. In response to this problem, the Company tried – and failed – to cure the Product Malfunctions during the Class Period. Instead, the Company provided jerry-rigged "solutions" to consumers – such as suggesting use of paper clips to unclog the needles – that only underscored the deficient quality of its product.

46. As demonstrated by, *inter alia*, the Company's pre-launch product testing, tracking of consumer complaints and reviews, and efforts to resolve or at least ameliorate the Product Malfunctions, Defendants were fully aware that the Product Malfunctions were material. Nonetheless, throughout the Class Period, Defendants knowingly or with deliberate recklessness made materially false or misleading statements and omissions to downplay the Company's disappointing launch and transition to the Keurig 2.0. In sum, Defendants misled investors by: (1) failing to disclose the existence of the Product Malfunctions; (2) falsely reassuring investors that disappointing sales were not caused by a failure of "execution," that the quality of the brewing systems was "excellent," and that there was "very, very little disappointment" with the brewers; and (3) falsely attributing disappointing sales solely to "transitory" and "conversion" issues associated with old pod inventory and compatibility constraints, while omitting the less temporary problems posed by the unresolved Product Malfunctions.

### B. The Keurig 2.0 Suffered from Material and Known Product Malfunctions that Went Unresolved at Least Through the End of the Class Period

47. FE-3, an Area Sales Manager who conducted more than 200 live demonstrations of the Keurig 2.0 between August 2014 and April 2015, in office settings and at trade shows, making between 25 and 500 brew cycles per demonstration, stated that "[e]very demo we did," the Keurig 2.0 malfunctioned "at least once." FE-3 resorted to bringing multiple brewers to every demonstration due

to the high likelihood that at least one brewer would cease working during the demonstration. FE-3 regularly received complaints from consumers, which FE-3 passed on to the corporate office, as required. Based on FE-3's experience in the field, FE-3 estimated that approximately 40% of complaints received from consumers related to product defects.

48. According to FE-1, a manufacturing engineer who worked closely with the development of the Keurig 2.0, the defects were strictly related to design flaws. FE-1 explained: "It's the way the brewer was designed to work, the software and electrical, the K 2.0 brewer and its heating, pump system, K-cups weren't meant to be used, the temp and pressure were a mess."

### 1. The Product Malfunctions Were Material and Known Design Defects

49. Despite being touted as a "breakthrough innovation," the Keurig 2.0 was plagued with product defects, including the following: (i) clogged brewing needles, resulting in the brewing process shutting down, brewing less coffee than desired, and/or grounds being deposited in the coffee; (ii) bursting pods, resulting in grounds and hot water spraying out of the brewer; and (iii) failure of the pump system, which is interrelated with the clogged needle defect. These three categories of significant defects collectively are called the Product Malfunctions.

50. Plaintiffs' counsel has independently reviewed the product reviews of the Keurig 2.0 brewing system that were submitted on the websites of retailers Amazon and Staples and on the website of *Consumer Reports* magazine from the launch of the Keurig 2.0 on August 24, 2014 through the end of the Class Period on August 5, 2015. *See* Crowell Decl. at ¶ 2. Specifically, Plaintiffs' counsel examined the reviews of the following Keurig models: K200, K250, K300, K350, K400, K450, K460, K500, K550, and K560. Crowell Decl. at ¶ 2.

51. According to the analysis of Plaintiffs' counsel, of the 8,062 ***total*** consumer reviews posted to the Amazon, Staples, and *Consumer Reports* websites from August 24, 2014 through August 5, 2015, 5.0% explicitly referenced one or more of the Product Malfunctions. Crowell Decl. at Exh. 1.

Further, of the 2,536 ***critical*** reviews[2] posted to the same websites during the same period, 16% explicitly referenced one or more of the Product Malfunctions. Crowell Decl. at Exh. 1.

**a) The Clogged Needle Defect**

52. As part of the brewing process, both the Keurig 1.0 and the Keurig 2.0 utilize needle(s) to puncture each portion pack. However, FE-1 explained that, unlike the Keurig 1.0, the Keurig 2.0, at the request of management, was designed to be compatible with Keurig Vue portion packs. The Keurig Vue was a brewing system that was introduced in 2012, and discontinued in 2015. The Vue allowed consumers to alter coffee strength and water temperature, but was largely unsuccessful. FE-1 explained that, after the failure of the Vue, the Company was burdened with twelve to fourteen expensive filling lines manufactured in Germany to package Vue portion packs, and the Company hoped to repurpose these portion packs for use in the Keurig 2.0. To effectuate this request, the three brewing needles in the Keurig 2.0 were placed at 45-degree angles. As a result of their angled placement, coffee grounds clogged the brewing needle(s). FE-1 stated that, as a result of these clogged needle(s), the Keurig 2.0 "sounded like it was dying."

53. The clogged brewing needle(s) also caused the machine's pressure to spike and the machine to sputter and power off. According to FE-1, "the brewer has a special algorithm, [whereby] if it has a certain event then it pauses to allow the pressure 10 seconds to come back down. . . The software knew there was a problem and paused, and the consumer assumed that was a problem, shut brew off and aborted the brew." A blockage was the type of event that caused the pressure to become too high and the machine to stop the brewing process. Because the Keurig 2.0 prematurely stopped the brewing process, the brewer would pour fewer ounces of coffee than what had been selected by the consumer ("short-cup"). FE-1 reported that the Company internally referred to these defects as, "no flow no brew short cup." Indeed, the Company's Brewer Support webpage instructs consumers

---

[2] Refer to Crowell Decl. at ¶ 3 for a comprehensive definition of "Critical Review."

that, "If your brewer is not brewing the full amount selected, it may be caused by the following: The exit needle is clogged by coffee grounds of cocoa mix."

54. Consumers also confirmed that the clogged needle defect caused the Keurig 2.0 to short-cup. For example, in January 2015, a consumer reported on Amazon:

> 1 week after purchase of the K550, I attempted to brew a carafe[,] which resulted in about a quarter of one cup of coffee. Several re-attempts resulted in the same fate. Keurig customer service… asked me to find a paperclip to try cleaning out (my one week old brewer), which did not help. Keurig succumbed and replaced the K550 with a new one via mail, which worked for about 10 single cup brews before it started short cupping… The quality issues on these machines is insurmountable.

55. Short pouring was not the only manifestation of the clogged needle defect, and consumers also experienced coffee grounds in their coffee. The Company's Brewer Support webpage again instructed consumers that, "Why am I getting grounds in my cup? Coffee grounds may have gathered in the exit needle."

56. Of the 2,536 critical reviews that consumers submitted on the websites of Amazon, Staples, and *Consumer Reports* from August 24, 2014 through August 5, 2015, 6.7% expressly referenced a clogged needle. Crowell Decl. at Exh. 1. Further, 4.9% of critical reviews referenced short pours, and 1.5% referenced coffee grounds in their coffee, which, as the Company itself acknowledges, are byproducts of the clogged needle defect. Crowell Decl. at Exh. 1.

57. According to FE-6, the Company knew that at least 2% of ***all*** consumers who purchased the Keurig 2.0 specifically complained about clogged needles, and these consumers "loud[ly]" complained about this particular defect. FE-6 acknowledged that because the Company can track only complaints registered by consumers, the actual occurrence of the defect was likely higher. Indeed, FE-6 stated that all of the Keurig 2.0 brewers were the same, so they ***all*** had the potential to manifest the clogged needle defect. As a Finance Manager of Strategy and New Product Development at Keurig, FE-6 was privy to information about consumer complaints. The new product development team was cross-functional, with people from finance, public relations, marketing, etc.

FE-6 received information about complaints as part of an internal Quality Assurance report that was internally distributed within the Company as part of the "overall discussions of quality and Keurig 2.0."

58. Moreover, the 2% level of complaints about the clogged needle defect substantially underestimates the magnitude and impact of the defect. Only a small fraction of consumers who experienced a clogged needle actually registered their complaint with the Company. According to one Arizona State University study, 61% of Americans surveyed said that complaining about a product or service was not worthwhile.[3] Research conducted by a customer service consulting firm showed that "for every 26 unhappy customers, only one will make the effort to make a formal complaint."[4] "Customers very rarely complain to the service/product provider. Instead they will tell their friends, who will in turn tell their friends, creating a pyramid of dissatisfaction."[5] It is estimated that a dissatisfied customer will tell the negative experience to 9 to 15 people, and 13% of dissatisfied customers will tell more than 20 people.[6]

59. FE-3 confirmed that the Keurig 2.0's needles clogged frequently during brewing. FE-3 stated, "there was no flow, the brewer just wouldn't brew," and "[o]ther times it brewed a short cup, and you would press eight-ounce and get four-ounces or two-ounces." When a clog occurred, FE-3 had to use a paper clip to unclog the needle and continue with the demonstration. FE-3 had to do this during most demonstrations.

60. The severity of the clogged needle defect is also corroborated by a number of actions taken by the Company to address the problem. First, in August and September 2014, the Company produced four YouTube channel videos (two in English and two in French) instructing consumers to

---

[3] *See* http://www.consumerreports.org/cro/magazine-archive/2011/july/shopping/customer-service/how-to-rattle-a-companys-cage/index.htm

[4] *See* http://www.forbes.com/sites/adrianswinscoe/2013/10/23/improving-government-by-solving-complaints-is-good-solving-the-silent-complaints-too-is-better/.

[5] *Id.*

[6] Süphan Nasır, *Customer Relationship Management Strategies in the Digital Era* (2015) at 96.

use a bent paperclip to clean the brewing needles when they got clogged. Second, the user guides that accompanied the K350, K450, and K550 all included a three step process for cleaning a clogged brewing needle, which also entailed the use of a paper clip. And third, according to FE-6, after the launch of the Keurig 2.0, the Company developed a "Brewer Maintenance Accessory" to send to unhappy consumers who complained about clogged needles; the Company began including the accessory with all Keurig 2.0 brewers in early 2015 (as explained below, this accessory was an inadequate solution to the clogged needle defect).

61. To the extent that the Keurig 1.0 also experienced a clogged needle defect, it was not the same as the Keurig 2.0's defect. As explained above, the Keurig 1.0 had two brewing needles that punctured the portion pack at the top and bottom, while the Keurig 2.0 had three needles. FE-1 stated that unlike the Keurig 1.0, the Keurig 2.0's needles were placed at 45-degree angles, a design modification intended to accommodate Vue portion packs. The Keurig Vue was designed after the introduction of the Keurig 1.0.

62. FE-6 stated that the clogged needle occurred at a far higher rate on the Keurig 2.0 than it had on the Keurig 1.0. The reason why clogged needles were more of a problem with the Keurig 2.0 brewer "was a very big topic of discussion [among the Quality Assurance team]."

63. The accounts of FE-1, FE-3, and FE-6 are corroborated by the Defendants' corrective disclosures on August 5, 2015, when Kelley expressly acknowledged the existence of the clogged needle defect. Moreover, in response to an analyst's question about "abnormally high" sales returns, Kelley responded that while compatibility constraints drove high sales returns initially, by the third quarter of 2015, sales returns were driven by the clogged needle defect.

**b) The Bursting and Spraying Pod Defect**

64. According to FE-1, during pressure testing of the Keurig 2.0 in the quality lab, the Company discovered that the brewer would cause certain K-Cups to burst, causing coffee grounds and

tea leaves to spray out of the brewer. Negative consumer reviews corroborate FE-1's statement. On July 11, 2015, one consumer reported on Amazon that: "First machine worked poorly. They sent me a second machine that is worse! K-Cups bursting during brewing and filling the machine, mug and counter with wet grounds!" Similarly, on February 6, 2015, another consumer reported on Amazon: "Big mess is the best I can describe it. Repeated exploding K-Cups with grinds everywhere. . . . I am sick of coffee grounds everywhere. It happens to other people also. I think they either messed up the machine design or the cup design. . . . This is going back and I'm looking for an older model."

65. Of the 2,536 critical reviews that consumers submitted on the websites of Amazon, Staples, and *Consumer Reports* between the product launch on August 24, 2014 and the end of the Class Period on August 5, 2015, 2.2% expressly referenced a bursting or spraying pod. Crowell Decl. at Exh. 1. While a lower percentage of dissatisfied consumers cited this defect than the clogged needle defect, a bursting and spraying pod is a more dangerous defect because it can involve the spraying of hot water from the brewer. In Keurig 2.0 reviews, consumers reported that "I have gotten 2nd degree burns when the k cups explode," and "[the product] can cause burns when exploding." According to the U.S. Consumer Product Safety Commission, the Keurig MINI was recalled in December 2015 because "water can overheat during brewing, spray out and burn consumers."

66. FE-3 stated that coffee grounds or tea leaves sprayed from the Keurig 2.0 "most times we demoed it," and it occurred as often as every 25 brews.

### 2. The Company Identified the Product Malfunctions Before the Start of the Class Period and Failed to Cure Them by the End of the Class Period

67. FE-1 states that the Product Malfunctions were identified during lab and consumer testing prior to the launch of the Keurig 2.0 in August 2014. The testing was conducted in the Spring of 2014, with more than 700 consumers participating in the tests. The Company's Production Test Coordinator, Eileen Goggin, was particularly concerned with the results of the tests and, according to FE-1, "brought up problems [raised by] home-use tests all the time: clogged needles and no-brew

were the main issues." FE-1 also explained that the Company generated internal reports regarding the results of these tests, which revealed the existence of the clogged needle, no-brew, and other malfunctions. These internal reports were disseminated to the technology team. FE-1 further states that Chief Technology Officer, Kevin Sullivan, who reported to Kelley daily, was the first to receive these reports. Thus, by September 2014, well before the start of the Class Period, the Company had identified the Product Malfunctions.

68. Nevertheless, Keurig management was undeterred by the array of Product Malfunctions and insisted on proceeding with an August 2014 launch, without remediating the Product Malfunctions identified in the consumer testing conducted in the Spring of 2014 and documented in the internal reports provided to Kevin Sullivan and, ultimately, to Kelley. This decision was motivated, at least in part, by management's desire to have the Keurig 2.0 on retail shelves in time for the 2014 holiday season. According to FE-1, "Brian [Kelley] is the reason why the brewer launched before it was ready, he gave a date and we had to rush the brewer. . . . There were major performance issues"; and "[the Keurig 2.0] had to launch for the holiday season."

69. In preparation of the August 2014 launch of the Keurig 2.0, Keurig produced 4.5 million Keurig 2.0 brewing systems, the largest production launch in the Company's history. The Keurig 2.0 brewing systems were produced in China and Malaysia. At the time of the product launch, this entire inventory of Keurig 2.0 brewing systems suffered from a design defect —*i.e.*, all Keurig 2.0 brewing systems had the same propensity for manifesting the Product Malfunctions. Further, because the Company had not resolved the Product Malfunctions, millions more defective brewers were being produced at the Company's facilities in China and Malaysia.

70. As alleged above, in early 2015, the Company began to distribute the Brewer Maintenance Accessory in a weak effort to placate consumers infuriated by the clogged needle defect. According to FE-6, before attempting to cure the design flaw, the Company's engineers first sought a

fix for the millions of Keurig 2.0 brewers that were already on the market or manufactured. This supposed "fix" was a clogged needle kit, called the "Brewer Maintenance Accessory." FE-6 states that "[engineers] were working on ways to fix it, to bring down the clogs, [and] they came up with the clogged needle tool."

71. In March 2015, the Company posted a YouTube video instructing consumers how to use the accessory. After informing consumers that "if you're having trouble brewing, there may be coffee grounds stuck in the brewer's entrance needle," the video walks consumers through an onerous process that includes the following steps: (i) fill the silicone bulb of the Brewer Maintenance Accessory with water, and place it in the pod holder; (ii) raise and lower the handle of the brewer no less than five times; (iii) remove the Brewer Maintenance Accessory from the pod holder, and discard the water and dislodged coffee grounds that have gathered in the silicone bulb; (iv) perform a "cleansing brew" by brewing six ounces of hot water; and (v) clean the Brewer Maintenance Accessory, allowing it to air dry before storing it "until the next use." Only after following these steps was a consumer even able to begin the process of brewing a cup of coffee.

72. The Brewer Maintenance Accessory was far from a viable solution to the clogged needle defect because it frustrated the purpose of the Keurig 2.0 – to provide fast and efficient single-serve coffee. Consumers were naturally displeased. For example, in July 2015, one consumer reported on Amazon:

> It worked very well the first two days but then got clogged up so that no water would come out. . . . Finally learned from an Amazon review that I needed to use the cleaner device, the "Brewer Maintenance Accessory" (it came with my machine, didn't have to contact the company as another reviewer did). Well, it turned out that a bunch of coffee grounds was caught in the needle that punctures the cup devices. Did the five times up and down thing several times until no more grounds came out. Now it is working again. I wonder how often I will have to do this!

73. It was not until after the 2014 holiday season, and the disappointing reception of the Keurig 2.0, that the Company even began to attempt to resolve the Product Malfunctions. At this time, the Company sent a technology team, which included FE-1, to its production facilities in

Malaysia to address the Product Malfunctions, with the goal of resolving the Product Malfunctions in time for the May 2015 launch of the K200. According to FE-1, upon returning from Malaysia in March 2015, the technology team "started trying to work on time, temperature and technical solutions." FE-1 stated that in or around April 2015, the Company shut down production of the Keurig 2.0 in China and Malaysia in part to make mechanical, electrical, and software modifications to the brewing system in an effort to resolve the Product Malfunctions.

74. FE-1 stated that despite the technology team's efforts, the Product Malfunctions persisted, and the technology team was continuing to address them at least through the end of the Class Period. Nevertheless, during the August 5, 2015 earnings conference call, Defendant Kelley falsely indicated otherwise:

> Bryan Spillane, Bank of America Merrill Lynch: And I just want to make sure, so in terms of the issue, whatever the issue is that's causing the clogged needle, that's been resolved as you go into the holidays?
>
> Defendant Kelley: We put changes in place in the 2.0 brewers that get resolved, that resolve this problem. In certain models, they roll out at different times. But yes, we have made the changes necessary to have the consumers see a brew algorithm that looks much more like the 1.0.

According to FE-1, however, "[Kelley] said that the issues were solved, [but] they weren't. I know because that's what I did every day. It wasn't resolved." FE-1 also stated that at the time FE-1 left the Company in August 2015, the Product Malfunctions were still unresolved. Similarly, FE-6 never learned that Keurig's engineers had found a ***design*** fix for the clogged needle during the Class Period, though FE-6 was in a position to know if one had been found.

75. FE-1's statements are corroborated by consumer reviews of the K200, which was developed and produced after the K300-K500 series and the K350-K550 series. The K200 was launched online in May 2015, and the Company had attempted to resolve the Product Malfunctions by then. Consumer reviews demonstrate that the Company failed.

76. On December 20, 2015, a K200 consumer reported on Amazon:

> If I could give this 0 stars I would. This machine will have you more aggravated than enjoying a cup of coffee. ***They obviously have a serious design flaw.*** Purchased first machine and had immediate problem after brewing second cup of coffee. ***After spending ½ with customer service it is clear they have a problem given that they had to include a 'needle maintenance kit' with the unit. Got bunch of annoying instructions like having to punch holes in the pod before inserting in the machine. We spent more time doing 'maintenance' than enjoying coffee. After the same immediate problem on day two, they sent us another machine. SAME result.*** This thing is truly garbage. I have been using Keurig machines for 5 years and love the concept of single cup serve. Now that there are other options, I'm going elsewhere because they have completely botched the next generation.

77. On February 28, 2016, a K200 consumer complained on Amazon:

> Since purchasing a Keurig 2.0 K200 three weeks ago, my wife and I have been met with nothing but frustration. We have spent much time carefully reading the instructional manual, and finally placing three calls to their support staff. Each call resulted in a different suggestion to resolve our many issues, but absolutely none of them worked. ***The K-Cups have exploded, leaked coffee and sprayed grounds all over the unit and cup. The system clogged up over and over, and despite our patient pod and needle cleaning procedures as per their manual and phone instructions, reclogged again immediately afterwards.*** We have probably wasted 30-plus K-Cups (and yes, we are using Keurig rated cups with the aluminum stripes around the top) to try to get this piece of junk to work, but there was no end to our issues. ***To add insult to injury, I have finally looked on the customer review site and was shocked to find so many customers who experienced the very issues which plagued us!*** I am kicking this thing to the curb, and hope to pre-warn anyone who is looking to buy this to look elsewhere and STAY AWAY from this one. Three assessments – Keurig K200 is a horribly defective product, offers little real support from repetitive 'techs' who obviously are panicking and guessing at solutions, and can cause burns when exploding.

(Emphasis added.)

78. Like the negative consumer reviews of the K200, consumer reviews of other Keurig 2.0 models continued to reference the Product Malfunctions well after the end of the Class Period. For example, on February 8, 2016, a K550 consumer complained on Amazon:

> Infuriating product. I'm not one of those guys who fires off bad reviews, but I don't where to begin expressing my total dissatisfaction with this product. Requires needle purge with included "brewer maintenance accessory" (should tell one something about reliability of product) every second or third pod brewed. Have had an older model for many years and have never had to deal with any clogging issues, needle or otherwise. Not once. Using only their proprietary pods included in bundle, ***the machine has made so many messes (blasting water/coffee grounds out sides of lid, continuing to brew without shutting off - coffee/water everywhere draining entire 80 oz reservoir, grounds all over inside of lid compartment) or will brew mere***

> ***drops only, wasting entire pods***. I've wasted $15 in Keurig K2 brand pods in the one month I've had this piece of junk.

(Emphasis added.)

79. As the above reviews demonstrate, the Product Malfunctions, particularly the clogged needle defect and the bursting and spraying pod defect, continued to persist through the end of the Class Period and well into 2016. As of the end of February 2016, the Company had failed to develop a satisfying solution – at least in the view of consumers – to the Product Malfunctions. Instead, the Company was continuing to impose inconvenient, inadequate half-measures on consumers, such as including the Brewer Maintenance Accessory with the Keurig 2.0, to the great consternation of consumers.

80. By the end of the Class Period, the Keurig 2.0's Product Malfunctions – in addition to the pod compatibility issue – had done irreparable harm to the positive consumer perception and enthusiasm generated by the successful Keurig 1.0 brewer.

### 3. The Keurig 2.0 Debuted with Low Consumer Approval Ratings and Experienced High Rates of Sales Returns; Keurig Was Aware of Poor Consumer Approval Ratings

81. Upon its debut, the Keurig 2.0 suffered from low consumer approval ratings and experienced high rates of sales returns. According to a report produced by UBS, in January 2015, across four major consumer websites – Amazon, Best Buy, Walmart, and Bed Bath & Beyond – and more than 20,000 consumer reviews, the average rating of the Keurig 2.0 was just 2.8 out of 5.0, significantly worse than the average rating of 4.2 given to older Keurig models. Moreover, only 70% of Keurig 2.0 purchasers were likely to recommend the product, as compared to 93% of purchasers of older Keurig models. FE-2, an Account Manager at Keurig during the Class Period, stated, "I was on a bus with the marketing team and they were horrified by the responses they were getting on Facebook. . . . As a rep I would google the company and every response was negative, just tons and tons of bad responses."

82. These low consumer approval ratings were due in significant part to the Product Malfunctions and not just to the pod compatibility constraints associated with the Keurig 2.0. As alleged above, of the 2,536 critical reviews posted to Amazon, Staples, and *Consumer Reports* from August 24, 2014 through August 5, 2015, 16.0% explicitly referenced one or more of the Product Malfunctions. Crowell Decl. at Exh. 1. This measure actually understates the salience of the Product Malfunctions because in the period surrounding the launch of the Keurig 2.0, consumers were outraged about the compatibility issue. In later periods, however, the Product Malfunctions constituted a significantly higher percentage of the critical reviews. For example, as of November 19, 2014, only 6.8% of consumer reviews referenced the Product Malfunctions, yet by May 6, 2015, this had risen to 13.7%. Crowell Decl. at Exh. 2, 4.

83. These consumers often highlighted that their dissatisfaction was caused by the Product Malfunctions, and not by compatibility constraints, and that they had previously been satisfied by the Keurig 1.0. For example, on January 29, 2015, a consumer reported on Amazon that:

> I scanned through the other one star reviews and it seems most of them don't like the 2.0 because of the he K-Cup monopoly factor. ***That is NOT my gripe. I hate this product because it clogs. The needles have to be cleaned at least once a week, sometimes more.*** I thought maybe I just got a defective machine so I returned it for a new one. About three days later… Same problems. I loved my old Keurig and after three years it finally died and I replaced it with the 2.0. Huge mistake. I contacted Keurig about the problems and they directed me to YouTube videos on how to clean them. If you buy this product, go ahead and get familiar with the videos because you will be cleaning it at least once a week and wasting K-Cups in the process.

(Emphasis added.)

84. The low consumer approval ratings dissuaded consumers from purchasing the Keurig 2.0, and the Company experienced lower than average sales of Keurig brewers and a disappointing holiday season. In fact, as compared to the prior year period, brewer and accessory net sales declined throughout the Class Period: 5% in the 2014 fourth fiscal quarter, 18% in the 2015 first fiscal quarter, 23% in the 2015 second fiscal quarter, and 26% in the 2015 third fiscal quarter.

85. While consumer approval ratings floundered and brewer net sales declined, Keurig also experienced high rates of sales returns. According to FE-2, "[the Keurig] 2.0 was a disaster, if you look at anywhere with customer comments, many, many say I packed it up and took it back to Target or Walmart." The Company was negatively impacted by the high rate of sales returns, and, according to FE-3, Keurig bore the cost of returns – not the retailer or distributor. FE-3 explained that, "[a]s long as it was within [the one-year] warranty they'd take it back." For example, FE-3 stated, "Staples would take [the brewer] back and then deal with Keurig directly."

86. FE-6 stated that the rate of Keurig 2.0 brewer sales returns was very high: Retailers such as Costco and Walmart had return rates in the low 20s. In comparison, the return rates for the Keurig 1.0 was in the upper single digits.

87. The Company was aware of the floundering consumer approval ratings and high rates of sales returns. The Company maintains a consumer service phone-line, and during the Class Period consumers regularly called the line seeking assistance with the Keurig 2.0 brewing system. For example, during the November 19, 2014 conference call, Kelley expressed his hope that the number of unhappy consumers utilizing this phone-line would gradually decline. By the February 4, 2015 conference call, he acknowledged that the phone-line was still regularly used by consumers seeking assistance with the Keurig 2.0, and stated that marketing changes implemented by Keurig during the quarter made the phone number more conspicuous to consumers. Kelley also stated that the Company "track[s] and analyze[s]" consumer ratings, and tracks call center data. As described in more detail in the sections to follow, the Company also held weekly meetings that tracked issues such as consumer complaints and high sales returns, and circulated these internal reports to Kelley and Rathke.

**4. The Product Malfunctions Were a Cause of the Deceleration and Eventual Decline of Portion Pack Net Sales**

88. The decrease in brewer and accessory net sales negatively impacted Keurig's sales of pod portion packs. As alleged above, consumers complained that the Keurig 2.0 brewers clogged,

resulting in a short cup or no cup of coffee, and that the pods would burst during the brewing process, spraying grounds, leaves, or hot water everywhere. The known Product Malfunctions not only dissuaded consumers from buying the Keurig 2.0, but even those who did buy the machine were more reluctant to use it, leading them to purchase fewer portion packs.

89. As previously alleged, under Keurig's razor and blade model, in which the Company sells the brewers essentially at cost while charging a markup for the portion packs, increasing the installed base of brewers translates to increased portion pack consumption, which is where the Company derives its profits. The inverse is also true: as brewer and accessory net sales declined, the Company's installed base grew more slowly than expected, and portion pack net sales decelerated and ultimately declined over the course of the Class Period.

90. Similarly, FE-6 states that Keurig's declining brewer sales was directly correlated to the Company consistently missing its sales goals – it fell short of sales expectations for four straight quarters after the launch of the Keurig 2.0. Further, according to FE-6, the Company's real money-maker is its pods, not the brewers, so the effect of declining sales hit the Company's bottom line.

91. As compared to the prior year period, portion pack net sales increased 22% in the 2014 fourth fiscal quarter, increased 9% in the 2015 first fiscal quarter, and increased 7% for the 2015 second fiscal quarter. During the 2015 third fiscal quarter, however, the problems with the Keurig 2.0 caught up with portion pack sales. At the end of the Class Period, the Company reported that, for the first time since the introduction of the Keurig 2.0, portion pack net sales actually declined 1% as compared to the prior year period.

92. Prior to the August 5, 2015, announcement of the Company's third fiscal quarter results, analysts had widely predicted revenue growth in portion pack sales. For example, according to Susquehanna Financial Group, LLP ("Susquehanna"), the consensus had predicted a 6% increase in portion pack revenue growth for the 2015 third fiscal quarter. Similarly, William Blair had predicted

a 5% increase in portion pack sales. The 1% decline in portion pack net sales shocked analysts, with SunTrust going so far as to say, "[t]he real surprise was the pod revenue decline."

**5. High Levels of Inventory and Dissatisfaction on Behalf of Retailers and Distributors**

93. The decrease in brewer and accessory net sales, combined with the high rates of sales returns, resulted in high levels of inventory at Keurig warehouses, distributor warehouses, and retailers alike. Keurig incurred costs associated with storing this massive amount of excess inventory, and the high levels of inventory at retailers and distributors negatively impacted the Company's relationships.

94. As a result of the Product Malfunctions and compatibility constraints of the Keurig 2.0, as well as the corresponding low consumer approval ratings, retail customers struggled to sell-through Keurig 2.0 brewers to consumers. According to SunTrust, sell-through of brewers was actually worse than shipment growth during the first quarter of fiscal year 2015; and according to William Blair & Company, L.L.C. ("William Blair"), sell-through at retail was lower by 11% for the second quarter of fiscal year 2015. Keurig sales teams experienced these lackluster results firsthand. FE-3, an Area Sales Manager for California, Nevada, Utah, and Arizona at Keurig during the Class Period, was responsible for Staples, one of Keurig's largest retail customers. FE-3 recalled that sales of the Keurig 2.0 in Staples "was very, very slow . . . they just weren't moving."

95. Poor sell-through at retailers translated to high levels of stagnant inventory at distributor warehouses. Keurig distributors are bound by an annual Keurig Authorized Distributor ("KAD") Agreement. Under the terms of the KAD Agreement, each distributor is required to sell a certain number of Keurig brewers to retain their KAD status. Distributors purchase brewers and accessories from Keurig, and sell them to retail customers. Because retail customers were unable to sell then existing Keurig 2.0 brewing systems through to consumers, demand on behalf of retail customers deteriorated. In an effort to sell the Keurig 2.0 in a low-demand market distributors were

forced "to discount brewers because they owned them." As FE-3 recalled, distributors were naturally angry about this development. Similarly, FE-2 stated that, after the launch of the Keurig 2.0, FE-2 spent most of his or her time attempting to minimize the negative impact of the Keurig 2.0, but distributors were still "dropping like flies." Even distributors FE-2 "couldn't imagine dropping" Keurig did drop it.

96. Ultimately, in or around April 2015, the Company shut down production of the Keurig 2.0 in China and Malaysia. At this time, millions of Keurig 2.0 brewing systems remained in inventory in the United States. Again, this remaining inventory was still plagued by the unresolved systemic Product Malfunctions. Production of the K200 did not resume until June 2015, and production of the K400 and K500 did not resume until nearly the end of July 2015. As FE-1 stated, the decision to shut down production was made in part because "[t]he brewers weren't moving so [Keurig] couldn't produce more." As explained above, production was also shut down to make necessary mechanical, electrical and software modifications to the Keurig 2.0 brewing system.

97. On May 6, 2015, at the Company's quarterly conference call, Keurig announced that it was implementing incremental promotional programs with retail partners to bring inventory down to more typical levels. Next, on August 5, 2015, at the Company's quarterly conference call, Keurig announced that it had implemented high promotional levels in an effort to clear inventory.

98. Overall, the inventory at the end of the 2015 first fiscal quarter was higher compared to the prior year period; during the 2015 second fiscal quarter, high inventory levels at retailers negatively impacted shipments; and by the 2015 third fiscal quarter, Keurig was still attempting to work through high levels of inventory at retail locations.

### 6. Kelley's and Rathke's Personal Involvement in the Introduction of and Transition to the Keurig 2.0

99. Keurig management is organized such that team leaders report to directors; directors report to senior directors; senior directors report to Vice Presidents; Vice Presidents report to

Presidents and Chief Officers; and the Presidents and Chief Officers ultimately report to Kelley.

100. FE-1 explained that Keurig held recurring meetings on Friday mornings that were attended by the directors of engineering, manufacturing, quality, product marketing, program management, data analytics, and customer service. These Friday meetings were held on the sixth floor of Building Two at the Company's Burlington, Massachusetts offices, and were run by the staff of the Senior Vice President of Quality and Manufacturing, John Naughton. During these Friday meetings, which FE-1 personally attended during the Class Period, the data analytics group presented various charts and reports showing current sales and tracking consumer complaints. Naturally, the charts presented by the data analytics group during the Class Period depicted declining brewer and accessory sales and consumer complaints. The President of Sales received the charts and reports compiled by the data analytics team, and the President of Sales reported directly to Kelley. Further, the Chief Technical Officer, Kevin Sullivan, who reported to Kelley daily, attended these Friday meetings at least through April 2015.

101. FE-1 further explained that in addition to these weekly meetings, Keurig generated internal reports about sales and complaints, which were passed on to Kelley. The Vice President of Sales, Strategy and Planning, FE-4, elaborated and explained that after the August 2014 launch of the Keurig 2.0, the Company began circulating a "daily dashboard" to the leadership board email distribution list, which included, among others: FE-4; the direct supervisor of FE-4, President of U.S. Sales and Marketing John Whoriskey; and FE-4 believes, Defendant Kelley. FE-4 stated that the daily dashboard was a collection of sales reports, customer shipments, consumer complaints, and "every metric associated with the launch." Each report was prepared by the individual department from which it came, and the reports were compiled into a consolidated PowerPoint document by the Keurig 2.0 launch team. FE-4 stated that the daily dashboard "was a bunch of metrics that was published daily at first and then weekly later on."

102. FE-5, an Industrial Engineer at Keurig, received weekly spreadsheets from the corporate office documenting consumer complaints about the Keurig 2.0. These weekly spreadsheets were widely circulated within the Company by email. Recipients could sort the spreadsheet by site, product, type of complaint, and various other metrics. FE-5 reported that the complaints concerned both compatibility constraints and machine defects, and that "[y]ou did hear about the dissatisfaction."

103. Overall, Kelley and Rathke had access to and/or reviewed the aforementioned reports presented at these meetings and circulated within the Company, as evidenced by the fact that each of the Defendants made statements to investors about the Keurig 2.0, including but not limited to its sales, consumer complaints, and inventory levels, as detailed throughout this Complaint. If Kelley and Rathke had not reviewed such information prior to making their public statements in this regard, their public statements had no basis and were deliberately reckless.

**C. Defendants Materially Misrepresented the Magnitude of the Problems Associated with the Introduction of and Transition to the Keurig 2.0**

104. During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Keurig's SEC filings and during its investor conference calls in regards to the introduction of and transition to the Keurig 2.0. These actionable statements and omissions fall into three categories: (1) omissions concerning the various Product Malfunctions that affected the introduction of and transition to the Keurig 2.0 brewing system; (2) misleading statements characterizing the problems associated with the Keurig 2.0 brewing system as "transitory," "seasonal," and/or a "conversion" issue; and (3) other statements falsely minimizing the magnitude of the problems plaguing the Keurig 2.0, such as denying that it was an "execution" issue and that there was "disappointment" with the brewers.

**1. 2014 Fourth Fiscal Quarter and 2014 Fiscal Year Financial Results**

105. On November 19, 2014, the first day of the Class Period, Keurig issued a press release titled "Keurig Green Mountain Announces Strong Fourth Quarter and Fiscal Year 2014 Financial

Results." For the fourth quarter, the Company reported net sales revenue growth of 14%, non-GAAP adjusted operating income growth of 26%, and GAAP adjusted operating income growth of 29%. The Company also reported a 5% decline in brewer and accessory net sales and a 22% increase in portion pack net sales for the quarter. For fiscal year 2014, the Company reported net sales revenue growth of 8%, non-GAAP adjusted operating income growth of 22%, and GAAP adjusted operating income growth of 24%. For the year, the Company also reported a 1% decline in brewer and accessory net sales and a 13% increase in portion pack net sales. Also on November 19, 2014, Keurig filed its annual report with the SEC on Form 10-K for the 2014 fiscal year, and Defendants Kelley and Rathke held an earnings conference call, during which they reiterated the financial results reported in the press release and the Form 10-K.

106. During the November 19, 2014, conference call, Defendant Rathke explained the high levels of Keurig brewer inventory:

> At the end of our fiscal year, inventory was $835 million, representing a 24% increase over the prior-year period, consistent with our expectation of inventory acceleration in the fourth quarter. ***The increase from the prior quarters is related to the normal fourth-quarter seasonality***, ***as we ship brewers for the holiday season.***

(Emphasis added.)

107. Rathke's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Although Keurig has traditionally increased inventory levels during its fourth quarter to prepare for holiday sales, the high level of brewer inventory on hand at the end of the 2014 fourth fiscal quarter was unusual, due in part to the fact that Keurig had recently executed the largest production launch in the Company's history (approximately 4.5 million Keurig 2.0 brewing systems) and brewer and accessory net sales had declined 5% during the 2014 fourth fiscal quarter, compared to the prior year period. Further, even if the high levels of Keurig brewer inventory were related to normal fourth-quarter seasonality, because the entire inventory of Keurig 2.0 brewing

systems suffered from unresolved and significant Product Malfunctions – a fact which the Defendants were well aware of – these high levels of inventory were bound to stay for far longer than the holiday season.

108. During the November 19, 2014, conference call, Defendant Kelley responded to an analyst's concern regarding the consumer response to the Keurig 2.0:

> Brian Holland, Consumer Edge Research: [I]s there anything, any consumer interaction that you're having that would give you any impression at this point? ***Again, I know it's early, but obviously, <u>you went through a testing phase as well</u>, that would give you an impression of how consumers who were not previously interested in purchasing Keurig or exposed to that platform, how they're responding to the 2.0?***
>
> Defendant Kelley: …[A] new consumer into Keurig, they absolutely love the 2.0. ***The scores, the satisfaction are as high as any we've ever seen***… They love the machine, the quality of the machine is excellent. ***We've seen very, very little, if any disappointment with the machine.***

(Emphasis added.)

109. Kelley's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. First, despite being asked a direct question regarding consumer testing, Defendant Kelley omitted material facts about the results of the Spring 2014 consumer testing, in which the Company identified the Product Malfunctions and, according to FE-1, the test results determined that "clogged needles and no-brew were the main issues."

110. Second, it was simply false that Keurig 2.0 consumers gave the machine high satisfaction scores and that the Company had seen "very, very little, if any disappointment with the machine." Before the product launch, the results of the product testing demonstrated the existence of the Product Malfunctions. And following the product launch, consumer reaction to the Keurig 2.0 was immediately negative, as reflected in critical consumer reviews complaining about, among other things, the Production Malfunctions, none of which were resolved by the end of the Class Period,

much less by November 19, 2014. Approximately 67.3% of all reviews submitted to Amazon, Staples, and *Consumer Reports* between the product launch and November 19, 2014, were critical, and of these critical reports, approximately 6.8% referenced one or more of the Product Malfunctions. *See* Crowell Decl. at Exh. 2.

111. The Company's senior management, including Defendants Kelley and Rathke, was well aware of the negative consumer response given that: (1) the Company held recurring weekly meetings during the Class Period that addressed, among other things, sales and consumer complaints and were attended by Keurig's directors of engineering, manufacturing, quality, product marketing, program management, data analytics, and customer service, certain of whom reported directly to Kelley; (2) the Company circulated a daily dashboard to upper management and senior leadership that included a report on consumer complaints; (3) the corporate office widely circulated weekly spreadsheets that documented consumer complaints, and which allowed recipients to organize and analyze complaints; and (4) the Company maintained a consumer service phone line, which Kelley admitted the Company tracked and analyzed.

112. During the November 19, 2014, conference call, Defendant Kelley responded to an analyst's question about the trend in online consumer reviews:

> Scott Van Winkle, Canaccord Genuity: If you could talk at all about maybe the trends you've seen with consumer reviews online?
>
> Defendant Kelley: Sure. First of all, Scott, overall, the 2.0, we're very pleased. ***The quality is excellent***…When we look at consumer response to the brewer, as I mentioned, ***quality is excellent***. What we do see, and we expected it, is that the customer who has unlicensed packs or packs that don't work in the 2.0 brewer, they're not pleased, and they call us, and we [thrill] them.

(Emphasis added.)

113. Kelley's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. The quality of the Keurig 2.0 brewing system was not excellent given that

it suffered from the Product Malfunctions – none of which were resolved during the Class Period. Moreover, consumer complaints were not limited to pod compatibility but extended to the poor quality of the machine itself. In fact, approximately 6.8% of the critical reviews of the Keurig 2.0 submitted to Amazon, Staples, *and Consumer Reports* between the product launch and November 19, 2014 concerned one or more of the Product Malfunctions. *See* Crowell Decl. at Exh. 2. The Company's senior management, including Defendants Kelley and Rathke, was well aware of the negative consumer response to the Keurig 2.0 given that: (1) the Company held recurring weekly meetings that discussed, among other things, consumer complaints; (2) the Company circulated a daily dashboard that included a report on consumer complaints; (3) the Company circulated a weekly spreadsheet that documented consumer complaints; and (4) the Company tracked and analyzed the complaints received through the consumer service phone line.

**2. 2015 First Fiscal Quarter Financial Results**

114. On February 4, 2015, Keurig issued a press release titled, "Keurig Green Mountain Announces Fiscal First Quarter 2015 Results." For the first quarter of fiscal year 2015, the Company reported no growth in net sales revenue, non-GAAP adjusted operating income growth of 4%, and GAAP adjusted operating income growth of 5%. The Company also reported an 18% decline in brewer and accessory net sales and a 9% increase in portion pack net sales. Keurig updated its outlook for fiscal year 2015, lowering its predicted revenue growth to mid- to high-single digits. The Company maintained that its revenue came in below expectations due in part to a weaker than expected holiday season and the voluntary recall on the Keurig MINI Plus.

115. Also on February 4, 2015, Keurig filed its quarterly report with the SEC on Form 10-Q for the 2015 fiscal first quarter. Defendants Kelley and Rathke also held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release and the Form 10-Q.

116. During the February 4, 2015 conference call, Defendant Kelley attempted to ease an analyst's doubts regarding the Keurig 2.0 by falsely assuring her that the nature of the problems associated with the Keurig 2.0 was transitory:

> Akshay Jagdale, Keybanc Capital Markets: Again, Brian, I think what I'm struggling with a little bit and I'd like to get your response to this, is, can you give us some – do you have any proof that the actions that you're taking are working in terms of these transitory issues, right? ***So what we see is a slowing installed base, inventory building up, and obviously you mentioned you missed your plan this holiday season. That's not a good trajectory, so are there any signs that you can point to that tell you that these are, in fact, transitory issues? When you have fixed them, you've seen some improvement?***
>
> Defendant Kelley: …***The very two things that we saw that prevented early on the rapid adoption of the 2.0 was the ratings. And those ratings came from incompatible portion packs***… The second piece is… we can see that the portion of those calls coming in is being reduced… So those are the two most salient features we can see that are changing and improving, that give us confidence that these are transitory issues that will be behind us.

117. Kelley's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. While compatibility constraints impacted consumer ratings, the ratings were also impacted, in significant part, by the Product Malfunctions, none of which were resolved during the Class Period, much less by February 4, 2015. In fact, approximately 8.3% of ***all*** reviews and 13.1% of ***critical*** reviews submitted to Amazon, Staples, or *Consumer Reports* between the product launch and February 4, 2015 concerned one or more of the Product Malfunctions. *See* Crowell Decl. at Exh. 3.

118. Even if the compatibility issue was "transitory," the impact of the Product Malfunctions was not, given that the Company failed to resolve these defects by the end of 2015. Therefore, the problems with the Keurig 2.0 could not truthfully have been described as "transitory" because there was no end in sight to the Product Malfunctions. Nevertheless, Kelley omitted information regarding the consumer ratings and complaints, despite having access to numerous

Company reports analyzing such ratings and complaints, including, but not limited to: a daily dashboard, a weekly spreadsheet, analyses of consumer complaints received through the Company's consumer service phone line, and charts and reports prepared by the data analytics group that tracked sales and consumer complaints.

119. During the February 4, 2015 conference call, Defendant Kelley responded to an analyst's question about the execution issues related to the launch of the Keurig 2.0:

> Judy Hong, Goldman Sachs: And then just a broader question related to what happened during the holiday season. I mean, a lot of the factors that I think you're calling out had to do – some of it, your execution… My question is really related to ***how do you, you know, decipher between that this is really just transitory issues and some of the ratings coming in weaker than expected*** earlier in the quarter?
>
> Defendant Kelley: …***[New users] love the product. If you've been a current Keurig owner for quite a while and you're trading up, and you had old packs, those were the ratings that were low… So we know that's a transitory issue. That's going to resolve itself. And it's going to resolve itself with some speed over time here, as we get through retailers clear of all that old inventory.***

(Emphasis added.)

120. Kelley's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Kelley misled investors by minimizing any consumer complaints about the quality of brewing system and attributing low ratings to the pod compatibility issue. Again, although compatibility constraints impacted consumer ratings, ratings were also impacted, in significant part, by the Product Malfunctions, none of which were resolved during the Class Period, much less by February 4, 2015. In fact, approximately 8.3% of ***all*** reviews and 13.1% of ***critical*** reviews submitted to Amazon, Staples, or *Consumer Reports* between the product launch and February 4, 2015 concerned one or more of the Product Malfunctions. Crowell Decl. at Exh. 3.

121. Kelley also misled investors by attributing the disappointing holidays sales to the pod compatibility issue and by stating that the problem was "transitory" – *i.e.*, as retailers' inventory of old

packs cleared out, consumers would start to buy the new packs. Because the disappointing sales of both the brewing system and the pods were at least in significant part caused by consumer dissatisfaction about the Product Malfunctions, the problem would not inevitably "resolve itself with some speed" merely by the clearing out of old pod inventory. The Product Malfunctions would need to be resolved as well. All of the Keurig 2.0 brewing systems in inventory at the time of this statement had the same propensity to exhibit the Product Malfunctions. As of February 4, 2015, no solution had been developed to resolve the Product Malfunctions – indeed, they have persisted at least through the end of 2015. Therefore, the problems with the Keurig 2.0 could not truthfully have been described as "transitory" because absent a design fix, the impact of the Product Malfunctions threatened to stretch out indefinitely.

122. During the February 4, 2015 conference call, Defendant Kelley again responded to an analyst's concerns about the execution of the launch of the Keurig 2.0:

> Caroline Levy, CLSA Americas: [M]y last question is just on supply chain, and trying to understand how the problem… arose with MINIs, and if there are – and again, even with the 2.0, the problems with the pods. ***It seems like a bit of an execution issue. What changes have you made so that you feel confident you're not going to have execution issues on the new brewers?***
>
> Defendant Kelley: Yes, Caroline, it's quite a different situation. The execution issue with this was a situation of how quickly do consumers' in-house pantries stock of pods convert…So the quality of the pods in brewers – the point I want to make sure everyone understands – the quality of the pods in brewers are excellent. They're excellent. ***The 2.0 brewers are excellent. The pods are excellent, always have been. We didn't have an execution issue that impacted anything like that. We have a conversion issue in terms of making sure the pods sell through, and that we get them exited from consumers' homes as quickly as possible – the old pods.***

(Emphasis added.)

123. Kelley's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. Despite Kelley's misstatement to the contrary, the Company did have "execution issues on the new brewers," as exhibited by the material and known Product Malfunctions.

Accordingly, while Keurig did face a conversion issue, it was far from the only or the most important problem it faced with regards to the introduction of and transition to the Keurig 2.0. It was materially misleading to attribute disappointing sales merely to the existence of old pods in consumers' homes while omitting the impact of the Product Malfunctions.

124. Due to Defendants' false and misleading statements and omissions made during the February 4, 2015, conference call, analysts reported that the problems associated with the introduction of and transition to the Keurig 2.0 brewing system were transitory, evidencing that the market was misled. For example, KeyBanc reported the following:

> Yesterday's results and management's commentary on the call validated our view (outlined in our preview note earlier this week) that holiday brewer sales were disappointing, but that the weaker than expected sales trends were driven by transitory issues such as the Mini recall, slow transition to portion pack inventory and negative online reviews. We came away from our follow-up calls with management feeling more confident that the aforementioned issues are transitory in nature and that the Company can course correct.

**3. 2015 Second Fiscal Quarter Financial Results**

125. On May 6, 2015, Keurig issued a press release titled, "Keurig Green Mountain Reports Fiscal Second Quarter 2015 Results." For the second quarter of fiscal year 2015, the Company reported net sales revenue growth of 2% (3% excluding foreign currency), non-GAAP adjusted operating income growth of 5%, and GAAP adjusted operating income growth of 6%. The Company also reported a 23% decline in brewer and accessory net sales and a 7% increase in pod net sales. Keurig again updated its outlook for fiscal year 2015, lowering its predicted revenue growth to flat- to low-single digits. The Company maintained that its top-line growth was below expectations primarily due to the slower than expected transition to the Keurig 2.0 system.

126. After the market closed on May 6, 2015, Keurig filed its quarterly report with the SEC on Form 10-Q for the fiscal second quarter. Defendants Kelley and Rathke also held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press

release and the Form 10-Q.

127. During the May 6, 2015, conference call, Defendant Kelley responded to an analyst's concerns regarding the alleged transitory nature of the problems associated with the Keurig 2.0:

> Steve Powers, UBS: [A] few weeks before the end of Q1, you gave a very upbeat address at the Beverage Digest Conference; and then, obviously, Q1 disappointed. And then more than halfway through this quarter, you gave, at least from my perspective, a similarly upbeat address at CAGNY. Saying that you were very, very confident 2.0 issues would be transitory, and the hot platform would get back on track in a timely manner. And here we are with lowered full-year expectations and momentum in the marketplace that's still struggling to take hold…
>
> Defendant Kelley: There's no inconsistency in the fact that ***the transition we talked about last quarter is the same transition we're taking about this quarter***… We know what the ***transition*** elements need to be. Some of the plans were in place; many of these are new because we have a clear indication, both on brewers and pods, of what's actually happening in the market. And it's complex. There's no question it is complex. It is not a simple process to ***transition*** like this.
>
> * * *
>
> Steve Powers, UBS: ***But is there anything from what you're seeing from the consumer that comes across to you as a key learning that has influenced your new thinking***…
>
> Defendant Kelley: Yes, the predominant message the consumer gave us, it differed between new users and current owners of Keurig. ***So the current owner of Keurig was obviously the one who had challenges with pod compatibility***.

(Emphasis added.)

128. Kelley's highlighted statements in the preceding paragraph were materially false or misleading at the time they were made, or omitted to state material facts necessary to make the statements not misleading. As the Class Period wore on, and as Keurig 2.0 sales growth continued to be negative, analysts and investors became increasingly skeptical about this supposed "conversion" and "transitory" issue that would "resolve itself with some speed," as Kelley had stated during the last earnings call. When analysts asked Kelley whether he was seeing something else that explained the problem, he Kelley doubled down, misrepresenting that the problem was still caused by the same "transition" that he discussed during the earnings call on February 4, 2015. Because the disappointing

sales of both the brewing system and the pods were at least in significant part caused by consumer dissatisfaction about the Product Malfunctions, this reassurance was misleading.

129. The problem was not merely a transition that would be inevitably resolved by the clearing out of old pod inventory and consumers getting over the compatibility constraints. The Product Malfunctions would need to be resolved as well. All of the Keurig 2.0 brewing systems in inventory at the time of this statement had the same propensity to exhibit the Product Malfunctions. As of May 6, 2015, no solution had been developed to resolve the Product Malfunctions – indeed, they persisted at least through the end of 2015. Therefore, the problems with the Keurig 2.0 could not truthfully have been described as "transitory" because absent a design fix, the impact of the Product Malfunctions threatened to stretch out indefinitely.

130. Nevertheless, following the May 6, 2015 conference call analysts expressed their confidence that the problem faced by Keurig was transitory, thereby evidencing that the market was misled. For example, Canaccord Genuity ("Canaccord") stated, "We continue to believe that the challenges are not a permanent detriment to household penetration growth. The primary shortfall in Q2 was lower portion pack volume. . . ." Similarly, by July 2015, prior to the announcement of the Company's 2015 third fiscal quarter disappointing results, KeyBanc actually stated, "Brewer sales trends are starting to inflect supporting our thesis that issues plaguing brewer sales last holiday season were in fact transitory and that brewer penetration has not reached a saturation point yet."

**D. Additional Allegations that Defendants Made Their False and Misleading Statements with Scienter**

131. The facts alleged above and summarized below give rise to the strong inference that Defendants intentionally or with deliberate recklessness made the materially false and misleading statements and omissions alleged herein.

132. **First**, the introduction of the Keurig 2.0 and the transition away from the Keurig 1.0 were the intense focus of investor attention and concern. For example, in September 2014, KeyBanc

predicted that the introduction of the Keurig 2.0 would help the Company increase its portion pack market share and added that: "[W]e maintain that it will be difficult for competitors to commercialize and legally produce 2.0-compatible portion packs and that they will find it difficult to keep up with future iterations of the Hot platform's operating system." KeyBanc also reported that "as the brewers become 'smarter' and allow consumers to produce a wider variety of beverages at home with a greater degree of customization, we believe the brewers will likely become more attractive to consumers, thereby increasing [the Company's] long-term household penetration potential."

133. Following the launch of the Keurig 2.0, as Defendants reported declining sales of brewers, analysts continually asked Kelley and Rathke about problems with the transition and whether the Company was overcoming those problems. For example, in the November 19, 2014 conference call, a KeyBanc analyst inquired, "Brian, can you just talk a little bit about the sell-through [*i.e.*, retail sales] on 2.0 and how you're seeing it." By the February 4, 2015 conference call, analysts' questions indicated increasing concern, and a KeyBanc analyst pointedly asked, "are there any signs that you can point to that tell you that [decreased brewer sales and increased levels of inventory] are, in fact, transitory issues?" By the May 6, 2015 conference call, analysts' questions had begun to focus on the inventory and sell-through issues, and a Goldman Sachs analyst asked, "Brian I guess maybe just a little bit of color on the point-of-sales trend . . . [a]nd then as you think about the inventory positioning exiting the second quarter, can you give us some sense of how much is left to get that cleaned out?"

134. Thus, Defendants had strong motivations to learn about and understand any material problems with the Keurig 2.0, including but not limited to the Product Malfunctions and their repercussions—for example, the declining sell-through at retailers and the inventory build-up.

135. **Second**, Defendants themselves emphasized the importance of a successful transition from the Keurig 1.0 to the 2.0, and this transition was the focus of their own statements to investors. During each quarterly conference call during the Class Period, Kelley and Rathke reported on the

status of the transition. In the face of declining brewer systems sales, they repeatedly reassured investors that the problems were merely "transitory" and minimized any problems with the Keurig 2.0. For example, in the February 4, 2015 conference call, in response to an analyst's question, Defendant Kelley provided the following assurances: "So we know that [consumer complaints are] a transitory issue. That's going to resolve itself. And it's going to resolve itself with some speed over time. . . ." Similarly, in the May 6, 2015 conference call, Defendant Kelley again assured analysts that the consumer complaints and declining brewer sales were part of a transition, and that "there's really no way to go through a transition like this without going through those issues."

136. Yet, while Kelley and Rathke were making these reassurances, they made a host of false and misleading statements and omissions that disguised the true magnitude of the underlying problems. Either Kelley and Rathke possessed the detailed personal knowledge of the Keurig 2.0's problems that they claimed to have, in which case they knew their statements were fraudulent, or they lacked personal knowledge about the Keurig 2.0's problems, in which case their repeated statements on the subject were deliberately reckless at a minimum.

137. **Third**, throughout the Class Period, Kelley and Rathke received information that alerted them to the true problems with the Keurig 2.0, including but not limited to the Product Malfunctions. FE-1, who managed a cross-functional team that worked from concept to production launch on developing the Keurig 2.0 brewing system and was the point person from business plan to launch, reported to the Director of Technology, Jim Lewicki, who reported to the Chief Technical Officer, Kevin Sullivan, who reported to Kelley daily. Indeed, when product testing of the Keurig 2.0 in Spring 2014 revealed the existence of the Product Malfunctions, Sullivan received the internal reports on the defects. Unsurprisingly, given the importance of the product launch, the Company had frequent meetings on the development of the Keurig 2.0 that were attended by senior leadership, including Sullivan, who reported directly to Kelley. Through these channels, Company personnel

who were leading the development of the Keurig 2.0 raised concerns about the Product Malfunctions and objected that a product launch in August 2014 was premature. Despite these well-informed objections, Kelley directed the Company to launch the Keurig 2.0 anyway, including the ill-advised production of several million highly flawed brewing systems.

138. After the introduction of the product in August 2014 and throughout the Class Period, the Company maintained a consumer service phone-line, and consumers regularly called the line seeking assistance with the Keurig 2.0 brewing system. The Company also tracked the call center data, and tracked and analyzed consumer ratings on an ongoing basis. Additionally, the Company held weekly meetings concerning the decreasing brewer and accessory net sales and consumer complaints, and it generated internal reports depicting these decreasing sales and consumer complaints, which were passed on to Kelley. Given that both Kelley and Rathke had access to these reports and each of them made detailed statements to investors about the Keurig 2.0, including but not limited to its sales, consumer response, and inventory, it would have been deliberately reckless of Kelley and Rathke not to have actually reviewed the reports.

139. **Fourth**, Defendants' own statements during the Class Period show that they monitored information regarding product testing results, consumer complaints and reviews, sales returns, and defect rates for the Keurig 2.0 – information that alerted them to the significance of the Product Malfunctions. For example, during the earnings call on November 19, 2014, when an analyst asked about consumer reaction to the product, including information gathered during the "testing phase," Kelley responded, "The scores, the satisfaction are as high as any we've ever seen." As alleged above, in reality, the testing phase revealed the existence of the Product Malfunctions. During the same conference call, when another analyst asked "trends you've seen with consumer reviews online," Kelley answered, "When we look at consumer response to the brewer, as I mentioned, quality is excellent." As alleged above, consumer reaction actually revealed the significance of the Product

Malfunctions. After the end of the Class Period, during the earnings call on August 5, 2015, when an analyst asked about Keurig's "abnormally high" sales returns, Kelley provided his analysis of "the two things that drove that increase in returns" – pod compatibility and the "clogged needle" defect. He also represented that the clogged needle defect rate was similar on the Keurig 1.0 and the Keurig 2.0. These statements demonstrate that either Defendants were monitoring this product information, which revealed the false and misleading nature of their statements, or Defendants were ignoring this information with deliberate recklessness.

140. **Fifth**, Defendants' materially false and misleading statements and omissions regarding the launch of the Keurig KOLD establish a pattern of Defendants' wrongdoing. Prior to the Class Period, on February 5, 2014, Keurig announced the introduction of the KOLD, a product designed to allow consumers to create their own iced teas, sports drinks, seltzers, flavored waters, and carbonated fountain drinks at home and in the workplace. To develop the pods for use with the KOLD, Keurig partnered with the Dr. Pepper Snapple Group and The Coca-Cola Company.

141. Like with the Keurig 2.0, Defendants emphasized the importance of the Keurig KOLD to the Company. On November 19, 2014, during the Company's quarterly conference call, Kelley stated: "[T]he long-term growth potential for Keurig [KOLD] in both North America and globally is significant. The cold beverage categories are more than 4 times the size of the hot beverage categories and consumer interest in this innovation is strong. . . . We expect that Keurig [KOLD] will grow its installed base at a faster rate than our hot platform given the strength and awareness of the Keurig brand versus 1998 when we launched our hot system; and we also believe it will globalize faster." Accordingly, on February 9, 2015, Trefis characterized the Keurig KOLD as the "highlight of 2015" and reported that "Keurig's most important objective of 2015 is the successful launch of Keurig [KOLD] in North America."

142. Throughout the Class Period, Defendants falsely represented that the KOLD was "on

track" and "on target" to be introduced to the market in the Fall of 2015. During the conference call on November 19, 2014, Kelley stated: "We are well on target to launch in the fall of 2015, well in time for the holiday season. We are on track with our product development efforts, including brewer technology, the manufacturing of pods and appliances, and all of the brand development required, including our own brands and partner brands." Although during November 19 call, Rathke disclosed that the Company's guidance for the entire fiscal year 2015 "factor[ed] in minimal revenue" from the KOLD, during the subsequent conference call on February 4, 2015, she said that the KOLD would have a "much more meaningful" contribution to fourth-quarter revenue—which was entirely consistent with a full launch in the Fall of 2015. During the same call, Kelley added, "Our plans are progressing well, and we're on track to launch this fall." And during the conference call on May 6, 2015, Kelley reiterated that the launch of the KOLD was "on track for the Fall of 2015."

143. Just eight days after the May 6, 2015 call, during which Kelley reiterated a Fall 2015 launch, on May 14, 2015, the Company announced the delay of the introduction of the Keurig KOLD. Specifically, Keurig announced that the Keurig KOLD would have a phased-in launch that would involve minimal sales in the Fall of 2015. The KOLD would be available for sale only on the Company's website in the Fall of 2015, then it would launch in select retailers in certain metropolitan areas in time for the 2015 holidays, and it would not reach full national retail distribution until the 2016 holiday season.

144. Defendants' statements about the KOLD launch being "on target" and "on track" for the Fall of 2015 were materially misleading because Defendants failed to qualify such statements by disclosing that it would be a phased-in launch with minimal sales in the Fall of 2015, rather than a full launch. Rathke's statement that the KOLD would have a "much more meaningful" contribution to fourth-quarter revenue reinforced the implication of a full launch. As an analyst at William Blair stated, investors expected millions of KOLD units to be sold within the first year of its launch, not

hundreds of thousands.

145. It is simply implausible that, throughout the Class Period, when Defendants represented that the KOLD was "on track" for a Fall of 2015 launch, they did not know that the KOLD was actually "on track" for a phased-in launch and would have minimal sales in the Fall of 2015. A phased-in launch cannot occur at the last minute or on a whim. It must be carefully planned with distribution and retail partners—*e.g.*, selecting the retailers and geographic areas, reaching agreement with those retailers, coordinating logistics for distribution, etc. And it would be absurd for Defendants not to have known of the phased-in launch by the time Kelley reiterated the timing on May 6, 2015, just eight days before the phased-in launch was announced.

**E. The Revelation of the Truth About the Keurig 2.0**

146. The truth that had been concealed by Defendants' fraudulent statements about the Keurig 2.0 was revealed on the last day of the Class Period, August 5, 2015. On that day, investors learned that the issues with the Keurig 2.0 were not transitory at all but a devastating failure of execution that were having a profoundly negative on the Company's financial performance.

147. After the market close, Keurig issued a press release titled, "Keurig Green Mountain Reports Third Quarter 2015 Results." At this time, the Company also filed its quarterly report with the SEC on Form 10-Q for the fiscal third quarter. For the fiscal third quarter, the Company reported disappointing results, including but not limited to a 26% decline in Keurig brewer and accessory sales, a 1% decline in pods sales, and a 5% decline in overall net sales revenue compared to the prior year period. This was the first quarter since the introduction of the Keurig 2.0 in which the Company experienced a decline in pod sales. In its Form 10-Q, the Company reported an $18 million write-off of Keurig 2.0 brewing systems inventory purportedly due to "obsolescence." The Company was also forced to update its outlook for fiscal year 2015, lowering its predicted revenue growth to a decline of low-single to mid-single digits compared to fiscal year 2014.

148. The Company maintained that its net sales were below expectations due in large part to lower installed base growth, brewer unit sales below expectations, and high promotional levels used to clear inventory. These disappointing results revealed, for the first time, the full magnitude of the entrenched and persistent problems associated with the Keurig 2.0 brewing systems, as well as the corresponding decline in portion pack sales.

149. Also after the market close on August 5, 2015, the Company filed its quarterly report with the SEC Form 10-Q for the fiscal third quarter. Defendants Kelley and Rathke also held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release and the Form 10-Q, and further explained that the $18 million write-off was due to "lower than anticipated sales of 2.0 brewers."

150. During the August 5, 2015 conference call, Kelley responded to an analyst's question about high sales returns, and described the Product Malfunctions associated with the Keurig 2.0:

> Bryan Spillane, Bank of America Merrill Lynch: [O]ne of the things that we had heard through the quarter is that returns have been a little bit abnormally high on the 2.0. And I see that in the balance sheet, or on the cash flow statement, the reserve for returns has gone up. So if you could talk about whether or not there has been a higher than normal level of returns on the 2.0, that would be helpful.
>
> Defendant Kelley: …[W]e have seen higher returns on 2.0. Initially, we saw higher returns. And we're clear on what drove those returns. Early on, it was about the compatibility. And then as we moved from compatibility, it became there's what some call a clogged needle. In reality, the clogged needle exists both on 1.0 and 2.0 at about the same level. But what the 2.0 did differently, the brew engine and the algorithm is different.
>
> And so if you were a consumer who had a Keurig prior and you got a new one, in some cases, in some locations with some pods, it would change the way it brewed. And so you might have thought that that was something that was different and you didn't like it and so consumers brought it back.
>
> And so those were the two things that drove that increase in returns… We put changes in place in the 2.0 brewers that get resolved, that resolve this problem. In certain models, they roll out at different times. But yes, we have made the changes necessary to have the consumers see a brew algorithm that looks much more like the 1.0.

151. During the August 5, 2015 conference call, Kelley also described the promotions the Company implemented to move through stagnant inventory:

> Brewer volumes were down 18% in the quarter, as we continue to work through the high levels of inventory at retail on reservoir brewers and experienced lower sales of MINI brewers, as we continue to restock that product at retailers. Brewer price realization declined in the quarter, due to investments we made in brewer promotions to work through inventory.
>
> Brewer net price realization decline 6%, as we had higher promotional levels in an effort to clear inventory.

152. Finally, during the August 5, 2015 conference call, Rathke reported an $18 million write-off of Keurig 2.0 brewing systems inventory due to "obsolescence" of finished goods and stated:

> I think we mentioned the write down of some of the brewers in the quarter. And I think that was essentially helping us be well positioned for this holiday with the right amount of brewers, both on our balance sheet and also to help ensure our customers have a good holiday POS quarter.

153. In response to these disclosures, on August 6, 2015, Keurig's stock price fell $22.31 per share, or nearly 30%, to close at $52.67 per share, on usually heavy trading volume.

## VI. LOSS CAUSATION

154. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

155. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and other Class members. During the Class Period, Plaintiffs and other Class members purchased or acquired Keurig securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly when information disclosed to the market for the first time corrected those material misrepresentations and omissions.

156. Prior to May 14, 2015, Defendants had misled investors regarding the delayed launch of the Keurig KOLD. Investors learned the truth, when, after the market close on May 14, 2015, Keurig held a webcast for investors and analysts unveiling the Keurig KOLD machine and

announcing that it would not reach full national retail launch until the 2016 holiday season. In reaction to Keurig's announcement, during the next trading day on May 15, 2015, the market drove down the value of Keurig's shares. Its stock declined more than 8.5% to a closing price of $93.91, a drop of $8.79 on usually heavy trading volume.

157. Before the end of the Class Period, Defendants also misled investors regarding the systemic Product Malfunctions affecting the Keurig 2.0, the poor quality of its brewer inventory, and the impact these problems would have on the Company's financial performance. As alleged above, the Product Malfunctions, in significant part, caused sales of Keurig brewers to decline, thereby dampening growth of the Company's installed base, and inhibited purchasers' use of the product, each of which negatively impacted sales of portion packs – the source of the Company's profits.

158. Investors learned the truth about the material and known Product Malfunctions plaguing the Keurig 2.0, and their repercussions, on August 5, 2015, the last day of the Class Period. After the market close, Keurig announced its 2015 third fiscal quarter results. As a result of the unresolved Product Malfunctions, brewer sales continued to decline during the third fiscal quarter, and, for the first time since the introduction of the Keurig 2.0, pod sales declined as well. Specifically, brewer and accessory sales declined 26%, pods sales declined 1%, and overall net sales declined 5% compared to the prior year period. Additionally, the Company reported non-GAAP adjusted operating income decline of 28% and GAAP adjusted operating income decline of 30%. The Company was also forced to update its outlook for fiscal year 2015, lowering its predicted revenue growth to a decline of low-single to mid-single digits compared to fiscal year 2014. These hugely disappointing financial results were the materialization of the risk concealed by Defendants' misstatements – the premature launch of the Keurig 2.0 and resulting Product Malfunctions.

159. Further, on August 5, 2015, Defendants disclosed that the Keurig 2.0 brewing system had been suffering from a clogged needle malfunction, and that the higher sales returns of the Keurig

2.0 were due, at least in part, to the clogged needle(s). Defendants also disclosed that the Company took an $18 million write-off of Keurig 2.0 brewing systems inventory due to "lower than anticipated sales of 2.0 brewers." Further, the Defendants disclosed that brewer net price realization declined 6% due to promotional programs implemented to lower inventory levels. These disclosures corrected Defendants' misstatements and omissions.

160. The market was astonished by these disclosures. For example, SunTrust issued an analyst report titled, "Worse Than (Even We) Expected; Weak F3Q/Guidance," in which it reported that "[w]hile we were not surprised by the guide down, the current state of affairs was much worse than expected." Under the heading, "3Q Disappoints, Let Us Count the Ways," SunTrust reported that Keurig missed its estimates in total revenue, pod revenue, and gross margin. SunTrust also reported that "[t]he real surprise was the pod revenue decline." In addition, Susquehanna issued an analyst report titled, "Keurig Green Mountain: Crisis of Confidence (Downgrading to Neutral)," in which it reported: "We put too much focus on the growth opportunity and the strength of the franchise, and not enough on the company's own execution and the lack of a sound strategic response to the various (although natural and expected) market challenges." Susquehanna further reported that "[t]he quarter disappointed in all the key metrics," and that "the miss [in brewer revenues] combined with sales guidance for low teens-growth for 4Q15 implies the brewer problems are far from over." Analysts at Susquehana, Canaccord, and Morgan Stanley all downgraded Keurig's stock in light of Defendants' disclosures.

161. In reaction to Defendants' corrective disclosures, during the next trading day on August 6, 2015, the Company's stock plummeted nearly 30% to a closing price of $52.67, a drop of $22.31 on unusually heavy trading volume.

## VII. PRESUMPTION OF RELIANCE

162. At all relevant times, the market for Keurig's securities was efficient for the following

reasons, among others:

(a) Keurig's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regular issuer, Keurig filed periodic reports with the SEC and NASDAQ;

(c) Keurig regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Keurig was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain of their customers.

163. As a result of the foregoing, the market for Keurig stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price. Under these circumstances, all purchasers of Keurig securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices, and a presumption of reliance applies.

164. In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 496 U.S. 128 (1972), because the claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

165. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements pleaded in this Complaint.

166. None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Keurig 2.0 and the Keurig KOLD.

167. To the extent that any of the false and misleading statements alleged herein can be

construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Keurig 2.0 and the Keurig KOLD. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Keurig were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

168. To the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, either the speaker knew that the statement was false or the statement was approved by an executive officer of Keurig who knew that the statement was false.

## IX. CLASS ACTION ALLEGATIONS

169. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Keurig securities traded on the NASDAQ from November 19, 2014, through August 5, 2015, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Keurig at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

170. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Keurig common shares were actively traded on NASDAQ. As of November 14, 2014, Keurig had 162,009,539 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members. Class members who purchased Keurig common shares may be identified from records maintained by

the Company or its transfer agents, and such members may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

171. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172. Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

173. Common questions of law and fact exist to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Keurig 2.0 or the Keurig KOLD;

(c) whether Defendants acted with scienter; and

(d) to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

174. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## X. CLAIMS FOR RELIEF

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants Keurig, Kelley, and Rathke**

175. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

176. This Count is asserted on behalf of all members of the Class against Defendants Keurig, Kelley, and Rathke for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

177. During the Class Period, Defendants knowingly or recklessly made untrue statements of material fact and omitted to state material facts necessary to make their statements made, in the light of the circumstances under which they were made, not misleading. These misrepresentations and omissions: (i) deceived the investing public, including Plaintiff and the Class, regarding, among other things, the Product Malfunctions plaguing the Keurig 2.0 brewing system and its introduction to the market; (ii) artificially inflated and maintained the market price of Keurig securities; and (iii) caused Plaintiffs and other members of the Class to purchase Keurig securities at artificially inflated prices and suffer losses when the true facts became publicly known.

178. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged in a course of conduct that operated as fraud on Plaintiffs and the Class. The facts alleged herein give rise to a strong inference that Keurig and each of the Individual Defendants made materially false and misleading statements and omissions with scienter. They knew or recklessly disregarded that the Class Period statements alleged herein contained material misrepresentations and omissions.

179. Keurig is liable for all materially false and misleading statements and omissions made during the Class Period, including such statements and omissions made during the following Keurig

conference calls:

(a) 4Q 2014 Earnings Call on November 19, 2014;

(b) 1Q 2015 Earnings Call on February 4, 2015; and

(c) 2Q 2015 Earnings Call on May 6, 2015.

180. Kelley is liable for the materially false and misleading statements and omissions he made during the Class Period, including such statements and omissions made during the following Keurig conference calls:

(a) 4Q 2014 Earnings Call on November 19, 2014;

(b) 1Q 2015 Earnings Call on February 4, 2015; and

(c) 2Q 2015 Earnings Call on May 6, 2015.

181. Rathke is liable for the materially false and misleading statements and omissions she made during the Class Period, including such statements and omissions made during the following Keurig conference calls:

(a) 4Q 2014 Earnings Call on November 19, 2014.

182. Plaintiffs and other Class members have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Keurig securities, and inflation was removed from the stock when the true facts became known. Plaintiffs and other Class members would not have purchased Keurig securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' material misrepresentations and omissions.

183. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages attributable to the fraud alleged herein in connection with their purchases or acquisitions of Keurig securities during the Class Period.

## COUNT II

**Violations of Section 20(a) of the Exchange Act**
**Against Individual Defendants Kelley and Rathke**

184. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

185. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

186. During their tenures as officers and/or directors of Keurig, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Keurig, they had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. They were able to and did control, directly and indirectly, the content of the public statements made by Keurig during the Class Period, thereby causing the dissemination of the material misrepresentations and omissions alleged herein.

187. In their capacities as senior corporate officers of Keurig, the Individual Defendants had direct involvement in the daily operations of the Company; in reviewing and managing its regulatory and legal compliance; and in its accounting, reporting, and public disclosure functions. They made the false and misleading statements alleged herein. Accordingly, the Individual Defendants, as a group and individually, were controlling persons of Keurig within the meaning of Section 20(a) of the Exchange Act.

188. Keurig is a primary violator of Section 10(b) and SEC Rule 10b-5 by its acts and omissions alleged herein. By virtue of their positions as controlling persons of the Company and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a), jointly and severally with and to the same extent as the Company is liable under Section 10(b)

and Rule 10b-5, to Plaintiffs and other Class members who purchased or otherwise acquired Keurig securities.

189. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases or acquisitions of Keurig securities during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

(a) declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b) awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d) awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: March 23, 2016

GLANCY PRONGAY & MURRAY LLP

By: *s/ Joshua L. Crowell*

Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell
Alexa J. Mullarky
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

THE ROSEN LAW FIRM, P.A.
Phillip C. Kim (*pro hac vice*)
275 Madison Avenue, Suite 3400
New York, New York 10116
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: info@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On March 23, 2016, I served the following document:

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as listed on the attached Court's ECF Service List.

And on any non-ECF registered parties:

By U.S. Mail: By placing true and correct copies thereof in individual sealed envelope: with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence or mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 23, 2016, at Los Angeles, California.

*s/ Joshua L. Crowell*
Joshua L. Crowell

# Mailing Information for a Case 3:15-cv-02766-VC Blasco v. Keurig Green Mountain, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randall W Bodner**
  randall.bodner@ropesgray.com,courtalert@ropesgray.com
- **Solomon B. Cera**
  scera@cerallp.com,keg@cerallp.com,jrl@cerallp.com,lakessler@cerallp.com
- **Joshua L Crowell**
  jcrowell@glancylaw.com
- **Richard L. Gallagher**
  richard.gallagher@ropesgray.com,kevin.daly@ropesgray.com,courtalert@ropesgray.com,april.kee@ropesgray.com
- **Anne Johnson Palmer**
  anne.johnsonpalmer@ropesgray.com,courtalert@ropesgray.com
- **Phillip C Kim**
  pkim@rosenlegal.com
- **Ronald Scott Kravitz**
  rkravitz@kravitzesq.com,rkravitz@sfmslaw.com,pleadings@sfmslaw.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Richard A McGuirk**
  Richard.McGuirk@leclairryan.com
- **Robert Scott McWhorter**
  robert.mcwhorter@leclairryan.com,dana.bardon@leclairryan.com,amy.smith@leclairryan.com
- **Alexa Jean Mullarky**
  amullarky@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Daniel B. Rehns**
  drehns@cohenmilstein.com,efilings@cohenmilstein.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Kevin Francis Ruf**
  info@glancylaw.com,egonsiorowski@glancylaw.com,kevinruf@gmail.com,cturner@glancylaw.com
- **Daniel S. Sommers**

dsommers@cohenmilstein.com,efilings@cohenmilstein.com

- **Steven J. Toll**
  stoll@cohenmilstein.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`